ESTATE of Bernard H. STAUFFER, Bonnie H. Stauffer, Executrix, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 22277, 22277–A and 22277–B.

United States Court of Appeals Ninth Circuit.

Oct. 25, 1968.

Norman B. Barker, (argued), of Gib-
,son, Dunn & Crutcher, Los Angeles, Cal.,
for petitioner.

Richard C. Pugh, (argued), Atty.,
Washington, D. C., Mitchell Rogovin,
Asst. Atty. Gen., Lester Uretz, Chief
Counsel, Lee A. Jackson, Harry Baum,
Martin T. Goldblum, Attys., Washington,
D. C., for respondent.

Before JONES*, BARNES, and
HAMLEY, Circuit Judges.

BARNES, Circuit Judge:

The issue before us is whether § 381
of the Internal Revenue Code, 26 U.S.C.
§ 381 (1954), carryovers in certain cor-
porate acquisitions,[1] permits a loss sus-
tained by the transferee corporation aft-
·er a corporate reorganization to be car-
ried back to a premerger taxable year of
one of three transferor corporations.
The Commissioner takes the position,
sustained by the Tax Court below, that
the reorganization falls within the defi-
nition of a statutory merger, 26 U.S.C. §
368(a) (1) (A), and therefore the carry-
back of net operating loss, 26 U.S.C. §
172, is proscribed. Treas.Reg. § 1.381
(c) (1)–1(b), example (2). The taxpay-
er contends that the reorganization is
one defined by § 368(a) (1) (F), "a mere
change in identity, form, or place of

---

\* Hon. Warren L. Jones, Senior Circuit
 Judge, Fifth Circuit, sitting by assign-
 ment.

1. Reference to the essential portions of
 section 381 hereinafter appears. Quota-
 tion of the entire section would unduly
 burden this opinion.

organization," and that such a loss carryback is proper under § 381(b)–1(a)[2] in accordance with § 172(b).[3]

The facts were stipulated in the Tax Court. At all times relevant to the proceedings below, Bernard H. Stauffer was the sole owner of three corporations, Stauffer Reducing Inc., of California (Stauffer California), Stauffer Reducing, Inc., an Illinois corporation (Stauffer Illinois), and Stauffer Reducing, Inc., of New York (Stauffer New York). Each of the three companies was engaged in the business of selling and promoting mechanical weight and posture control devices which were manufactured by the California and Illinois corporations. The officers and directors of each of the companies were the same, board meetings of each of the three companies were always held at the home office of Stauffer California in Los Angeles, and the books of the three corporations were kept in Los Angeles. Each corporation filed a separate income tax return.

In 1958 Mr. Stauffer decided to relocate the Stauffer operations in New Mexico, and in pursuit of this end a shell corporation, Stauffer Laboratories, Inc., of New Mexico (Stauffer New Mexico)

was incorporated in 1959. A formal merger agreement was approved by Mr. Stauffer in his capacity as sole stockholder of each of the four corporations, whereby the California, Illinois and New York corporations were to merge into Stauffer New Mexico. By the terms of the agreement, the stated capital, paid-in surplus and retained earnings of Stauffer New Mexico were to equal the sums of the respective items of the three transferor corporations; all property of whatever kind owned by the three constituent corporations was to be vested in the New Mexico concern; and the liabilities and obligations of each of the three transferring corporations were to become the responsibilities of Stauffer New Mexico. On the effective date of the merger the separate existences of each of the three constituent corporations were to cease. On October 1, 1959, the merger was consummated by the filing of the merger agreement with the secretaries of state in each of the four respective states.

Prior to the consummation of the merger, Mr. Stauffer sought and obtained from the Internal Revenue Service a ruling that the contemplated venture constituted a "statutory merger" within the terms of § 368(a) (1) (A). In accordance with this ruling, it was required

---

2. "(2) *Reorganizations under section 368(a)(1)(F).* In the case of a reorganization qualifying under section 368(a) (1) (F) (whether or not such reorganization also qualifies under any other provision of section 368(a) (1)), the acquiring corporation shall be treated (for purposes of section 381) just as the transferor corporation would have been treated if there had been no reorganization. Thus, the taxable year of the transferor corporation shall not end on the date of transfer merely because of the transfer; a net operating loss of the acquiring corporation for any taxable year ending after the date of transfer shall be carried back in accordance with section 172(b) in computing the taxable income of the transferor corporation for a taxable year ending before the date of transfer; and the tax attributes of the transferor corporation enumerated in section 381(c) shall be taken into account by the acquiring corporation as if there had been no reorganization."

3. "(1) *Years to which loss may be carried.—*

"(A)(i) Except as provided in clause (ii), a net operating loss for any taxable year ending after December 31, 1957, shall be a net operating loss carryback to each of the 3 taxable years preceding the taxable year of such loss.

\* \* \* \* \*

"(2) *Amount of carrybacks and carryovers.*—Except as provided in subsections (i) and (j), the entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the 'loss year') shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. \* \* \*"

that each of the transferor corporations file a closing income tax return as of the last day of its existence, September 30, 1959. § 381(b) (1). As the three corporations reported their income on the fiscal year basis, February 1, to January 31, their respective closing tax returns were to have reflected their income over the eight month period, February 1, 1959, to September 30, 1959. On December 15, 1959, requests on behalf of each of the transferor corporations were filed for an extension of time within which to file their closing returns. Along with these requests were tendered the amounts of $300,000 in the name of Stauffer California, $200,000 in the name of Stauffer Illinois, and $7,500 in the name of Stauffer New York. The three corporations never filed separate returns. At the close of its fiscal year, January 31, 1960, Stauffer New Mexico filed a single tax return reporting the income of the California, Illinois and New York corporations from February 1, 1959, to September 30, 1959, as well as reporting its income from the date of the merger, October 1, 1959, to January 31, 1960. Accompanying the tax return was the following explanation of the single return in lieu of the three returns due on behalf of the transferring corporations as of September 30, 1959:

> "Taxpayer [Stauffer New Mexico] has been advised by counsel that inasmuch as the reincorporation of [the] California, Illinois, and New York [corporation] in the State of New Mexico involved no change in the existing stockholders or change in the assets of the corporations involved, but was intended to effectuate relocation of the corporate domiciles in the State of New Mexico, the reorganization is within the scope of section 368(a) (1) (F) and section 381(b); that under the authority of Rev.Rul. 57–276 (1957–1 C.B. 126), a single return must therefore be filed by Stauffer Laboratories, Inc., for the fiscal year commencing February 1, 1959, and ending January 31, 1960, claiming only a sin-

gle surtax exemption, and combining the operations of all the corporations for the entire fiscal year, and that separate closing returns for [the] New York, Illinois, and California [corporations] should not be filed."

The Commissioner contested neither Stauffer New Mexico's characterization of the merger as an "F" reorganization nor the filing of the single tax return. The computed tax was $356,701, and applying the previous sums tendered in the names of Stauffer California, Stauffer Illinois, and Stauffer New York, Stauffer New Mexico claimed, and was paid a refund.

The contemplated relocation in New Mexico of the physical assets of the Stauffer enterprises did not take place. The business was operated precisely as it had been previously. There was no change in officers, directors or shareholders. Beginning in the latter part of 1959, publicity unfavorable to the mechanized weight control industry began to take its toll of Stauffer's sales volume. Increased competition in the industry caused further decreases in Stauffer's share of the market. In its tax return for the fiscal year ended January 31, 1961, Stauffer New Mexico reported a net operating loss of $3,366,052. On April 10, 1961, the corporation filed an Application for Tentative Carryback Adjustment, requesting a refund of $1,481,653 paid in taxes by Stauffer California for the year ended January 31, 1958, and of $263,194 of the taxes paid by that same company for the year ended January 31, 1959. The application stated that Stauffer New Mexico was "a continuing corporation pursuant to a reorganization under IRC Section 368(a) (1) (F)." The carryback adjustment (known as the "quickie" refund) authorizes the secretary or his delegate to make such a refund to the taxpayer within 90 days of his application therefor. 26 U.S.C. § 6411. The application was approved and the adjustment paid, with interest. Following the close of the fiscal year on January 31, 1961, Stauffer New Mexico was dissolved. The business was carried on by Mr. Stauffer as a sole pro-

prietorship. Consequently, although the "quickie" refund was paid by checks drawn to Stauffer New Mexico, the checks were negotiated by Mr. Stauffer, as trustee in dissolution and former sole stockholder of the dissolved corporation.

In June, 1963, the Commissioner assessed deficiencies against Stauffer New York in the amount of $6,943.95 for the period February 1, 1959, to September 30, 1959, against Stauffer Illinois in the amount of $340,822.82 for the same period, and against Stauffer California in the amount of $412,021.19 for the same period. In addition, the income tax of Stauffer California for the years ended January 31, 1958, and January 31, 1959, were determined to be deficient in amounts equal to the loss carryback refund adjustments paid to Stauffer New Mexico, $1,481,653 and $213,472, respectively. Liability for the deficiencies was attributed to petitioner as the transferee of the assets of Stauffer New Mexico which in turn was transferee of the assets of each of the corporations whose income taxes had been assessed deficient. From judgments of the Tax Court adverse to petitioner on each of the assessed deficiencies, Bonnie H. Stauffer, Executrix of the Estate of Bernard H. Stauffer, appeals. Our jurisdiction to review the judgment of the Tax Court rests on 26 U.S.C. § 7482.

In § 368 Congress defined the term "corporate reorganization" for purposes of providing for the tax-free exchange of corporate enterprises. In § 368(a)(1) six types of corporate transactions are defined as beneficiaries of tax-free treatment: (A) a statutory merger or consolidation; (B) and (C) acquisitions by one corporation of the controlling voting stock or substantially all the assets of another corporation; (D) transfers to certain controlled corporations; (E) a recapitalization; or (F) "a mere change in identity, form, or place of organization, however effected." The proposition un-

derlying the tax-free corporate exchange is "that the new enterprise, the new corporate structure, and the new property are substantially continuations of the old still unliquidated." Treas.Reg. § 1.1002–1(c). Continuity of investment lies at the heart of the tax-free exchange. This much may be said for each of the definitions (A) through (F) in § 368(a)(1). However, § 368(a)(1) is a definitive section, inoperative in and of itself. It takes on significance when considered in light of other sections of the code.[4] That section of the code with which we are here concerned as it and § 368(a)(1) interrelate is § 381, providing that the operating loss carryover, earnings and profits, and other tax attributes of a transferor corporation are passed on to the transferee or acquiring corporation, subject to the limitations set forth in § 382(b).

We deal here with the question of whether the transaction heretofore described, is an "F" reorganization within the definition of that term in § 368(a)(1). If an "F" reorganization took place, § 381(b) provides:

"Operating rules.—Except in the case of an acquisition in connection with a reorganization described in subparagraph (F) of section 368(a)(1)—

\* \* \* \* \* \*

\* \* \* \* \* \*

(3) The corporation acquiring property in a distribution or transfer described in subsection (a) shall not be entitled to carry back a net operating loss for a taxable year ending after the date of distribution or transfer to a taxable year of the distributor or transferor corporation."

Assuming an "F" reorganization was effected, Stauffer New Mexico was entitled to carry back its net operating loss to the taxable years of its transferor corporations.[5]

The "F" reorganization is defined in § 368(a)(1) as "a mere change in identity, form, or place of organization, how-

---

4. See §§ 354, 356, 357, 358, 361, 362(b) and 381.

5. Whether a carryback as to only *one* of the transferor corporations is permissible is another question, discussed, infra.

ever effected," and is not further defined in the regulations. There is a dearth of administrative and judicial attention to this section of the code.[6] There is no case law dealing with the problem before us. The "F" reorganization first appeared in the Revenue Act of 1921, § 202(c)(2), as a "mere change in identity, form, or place of organization of a corporation." In 1924 the reenactment of the Revenue Act left the section unchanged except for the deletion of the words "of a corporation." In 1954 the House proposed the repeal of § 368(a)(1)(F) because the corporate alterations it permitted could be accomplished through other types of reorganizations. See generally, Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, 548 (2d ed.1966); Paul, Studies in Federal Taxation, 82 (3d ser. 1940); 3 Mertens, Law of Federal Income Taxation § 20.94. The proposal was rejected, however, and the "F" reorganization was carried over to the 1954 code. 1 Hearings Before the Senate Committee on Finance on the Internal Revenue Code of 1954, 83rd Cong., 2d Sess., at 403, 539 (1954).

The cases in which the "F" reorganization has been brought into litigation revolve principally around the reorganization-liquidation problem, wherein the shareholders of the liquidated transferor corporation in an "A", "C" or "D" type reorganization seek to treat the increment realized on the redemption of their shares as capital gains. 26 U.S.C. §§ 331, 337. In such cases, the Commissioner has advocated that the transferee corporation has in effect consummated but a "mere" reincorporation under § 368(a)(1)(F) and therefore the liquidation distribution payments to the shareholders of the transferor corporation are in fact dividends, taxable at ordinary rates. Davant v. Commissioner of Internal Revenue, 366 F.2d 874 (5th Cir. 1966), cert. denied, 386 U.S. 1022, 87 S. Ct. 1370, 18 L.Ed.2d 460 (1967); Reef Corp. v. Commissioner of Internal Revenue, 368 F.2d 125 (5th Cir. 1966); Commissioner of Internal Revenue v. Berghash, 361 F.2d 257 (2d Cir. 1966); Pridemark, Inc. v. Commissioner of Internal Revenue, 345 F.2d 35 (4th Cir. 1965); San Joaquin Fruit & Investment Co. v. Commissioner of Internal Revenue, 77 F.2d 723 (9th Cir. 1935); Ahles Realty Co. v. Commissioner of Internal Revenue, 71 F.2d 150 (2d Cir. 1934).

From the foregoing cases evolve two principles which form the basis of the controversy in the case before us. The Commissioner contends, with the exception of the holding in Davant v. Commissioner, supra, that these cases stand for the rule that an "F" reorganization is restricted in number of participating corporations to one. That is, section (F) of 368(a)(1) applies only to the reorganization of a single corporation, and a multi-corporate merger defeats the right of the surviving transferee corporation to carry back losses under § 381(b). It is asserted that the acquiring corporation cannot be treated, for tax purposes, as standing in the shoes of all of the pre-merger transferor corporations. Treas. Reg. § 1.381(b)-1(a)(2). The taxpayer replies that, to the contrary, each of the above cited cases, and Davant v. Commissioner in particular, stands for the proposition that continuity of ownership and continuity of business enterprise are the only indicia of an "F" reorganization, regardless of the number of merging transferor corporations.

We are wary of an easy solution which predicates its reasoning on literal compliance with the code provisions and the rules resulting therefrom. "[L]iteral compliance with the reorganization provisions is not enough; a transaction will be governed by the statutory provisions *only if it comes within their presuppositions* as well as their language." Bittker & Eustice, supra, at 505. (Emphasis added.) The proposition underlying the continuity of interest rationale as applied to the statutory definition of cor-

---

6. "The section, though aged, has received almost no administrative or judicial attention until recently." Pridemark, Inc. v. C.I.R., 345 F.2d 35, 42 (1965).

porate reorganization is to deny tax-free status to the transaction which is in fact a "sale" although it complies with the literal definition of a reorganization. Davant v. Commissioner, supra, 366 F.2d at 885; Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355 (1940); Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284 (1935); Pinellas Ice & Cold Storage Co. v. Commissioner of Internal Revenue, 287 U.S 462, 53 S.Ct. 257, 77 L.Ed. 428 (1933); Treas.Reg. §§ 1.1002–1(c), 1.368–1(b). The rationale behind the continuity of business enterprise requirement is to prevent the liquidation transaction taxable as ordinary income from disguising itself as a capital gains distribution. Pridemark, Inc. v. Commissioner, supra; Standard Realization Co., 10 T.C. 708

(1948); see Treas.Reg. § 1.368–1(b). The liquidation transaction sought to be denied the tax-free privilege is one in which business activity terminates, as opposed to the continuity existing in a liquidation-reorganization transaction. Bearing these underlying purposes in mind, the taxpayer's argument falls short of attributing to the "F" reorganization characteristics which are indicative of a congressional intent other than that which is attributable to the other reorganization definitions in § 368(a) (1).

The six reorganizations defined in § 368(a) (1) are not necessarily mutually exclusive. At least it seems undisputed that an "F" reorganization may also qualify under one of the other reorganization definitions, and the Commissioner of Internal Revenue has so ruled.[7]

---

7. "In the case of a reorganization qualifying under section 368(a) (1) (F) (whether or not such reorganization also qualifies under any other provision of section 368(a) (1)), the acquiring corporation * * * [etc.]." Treas.Reg. § 135 1(b)-1(a) (2).

"Often a reorganization under section 368(a) (1) (F) of the Code will meet the requirements of (A) (C) or (D) of section 368(a) (1). It is believed it was not the intention of Congress in enacting section 368(a) (1) of the Code to hold that just because a reorganization meets some other provision of section 368(a) (1) the provisions of subparagraph (F) of that section are not complied with, even though the transaction also qualifies under subparagraph (F). Taking a contrary view under the 1954 Code would, for all practical purposes, defeat the provisions of section 381(b) * * *." Rev.Rul. 57–270, 1957 C.B. 126.

The transaction was held to come within section (F), notwithstanding the fact that it qualified under another part of section 368(a) (1). That ruling involved two corporations which severally merged into two corporatoins organized in different states. One original corporation had no subsidiaries. The other was the parent of an affiliated group of corporations which had filed consolidated income tax returns. For the latter:

"the same affiliated group with the acquiring corporation as parent remains in existence for the purpose of filing a consolidated return. * * *"

In Rev.Rul. 58–422, the holding of 57–276 was reaffirmed, and the rule applied to a parent corporation and its two subsidiaries, merged into a new corporation. Its stock was issued share for share for stock of the old parent corporation, and the subsidiaries' stock was cancelled.

Rev.Rul. 58–422 continues:

"[T]here is no change in the existing stockholders or change in the assets of the corporations involved. In the instant case, the fact that the subsidiaries of the former parent were liquidated at the same time that the said parent reincorporated in a different state did not constitute a change in the stockholders or assets of the merged corporation. The stockholders of the former parent had the same equity in the surviving corporation that they had in the three old corporations, ·inasmuch as all of the assets of the three transferor corporations were held by the surviving corporation. In this connection, had the subsidiaries liquidated under the nontaxable provisions of section 332 of the Code before the merger and, subsequently, the parent reincorporated in a different state, the latter transaction would have been considered a reorganization coming within the provisions of section 368(a) (1) (F) of the Code. The fact that the two transactions were consummated simultaneously does not change the above conclusion.

"In view of the foregoing, it is held that the transaction in the instant case, insofar as it relates to the transfer of the assets and liabilities of the parent

The Commissioner's position, that the "F" reorganization is restricted to but one participant, likewise presents problems. In Davant v. Commissioner, supra, the Fifth Circuit had under consideration a liquidation-reorganization transaction. There, two corporations, "Water" and "Warehouse," were both owned in equal proportions by four families who sought to transfer the operating assets of Warehouse to Water and then liquidate Warehouse. In an effort to preserve the capital gains treatment of the Warehouse stock, a plan was carried out whereby the Warehouse stock was sold to a person not connected with the families or the corporations who in turn sold the Warehouse assets to Water at a price which allowed the individual to make a reasonable profit. Warehouse was then liquidated, without disruption of its business activities. The families reported the gain realized on the transfer of their Water stock as capital gains. The Commissioner assessed deficiencies, arguing that the reported gain to the extent of the earnings and profits of both Water and Warehouse must be taxed as ordinary income, the profit being nothing more than a dividend paid in the course of a corporate reorganization.

The Tax Court held that the transaction constituted a § 368(a) (1) (D) reorganization, rejecting the Commissioner's argument that the reorganization was also a section (F) reorganization, but holding that the gain was taxable as a dividend only to the extent of Warehouse's earnings and profits. On appeal, the Commissioner sought to have the gain realized from Water's earnings and profits taxed as dividends. In concluding that following the transaction the stockholders owned only stock in Water but that the certificates reflected the combined assets of both Water and Warehouse and therefore the earnings and profits of Water were taxable as dividends to the extent of the gain realized by the transfer of the

Warehouse assets, the Fifth Circuit held that the transaction was *both* a "D" and an "F" reorganization. In discussing a section 368(a) (1) (F) reorganization, the court said it could not cover "a substantial shift in the proprietary interest in a corporation accompanying a reorganization," citing Helvering v. Southwest Consol. Corp., 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942), but would include "a mere change in *form* as opposed to a change in substance." If the corporate enterprise continues uninterrupted, except for a distribution of some liquid assets or cash, § 368(a) (1) (F) can be applied. The court states there was, in *Davant*,

> "[A] change of corporate vehicles but not a change of substance. If Water had no assets of its own prior to the transfer of Warehouse's operating assets to it, could we say that Water was any more than the alter ego of Warehouse? The answer is no. The fact that Water already had other assets that were vertically integrated with Warehouse's assets does not change the fact that Water was Warehouse's alter ego. Viewed in this way, it can make no practical difference whether the operating assets were held by Water or Warehouse, and a shift between them is a mere change in identity or form. *At least where there is a complete identity of shareholders and their proprietary interests, as here, we hold that the type of transaction involved is a type "F" reorganization."* 366 F.2d at 884 (emphasis added).

The Commissioner does not favor the *Davant* case. He argues that the court therein rested its decision on the fact that the reorganization was of the "D" type; that the finding that there also occurred an "F" reorganization was "unnecessary to its decision." But, the finding that the reorganization was a "D" type was likewise unnecessary to the decision. As

to the new corporation, constitutes a reorganization within the meaning of section 368(a)(1)(F) of the Code (even though it also qualifies under

section 368(a)(1)(A)), notwithstanding the fact that the two subsidiaries of the parent were also parties to the merger agreement."

stated by the court, "Whether we reach this result [that the combined earnings and profits of the two companies are to be taxed as dividends to the extent of the gain realized] by means of calling the transaction a type (D) or type (F) reorganization * * * makes no difference." 366 F.2d at 887. But, says the Commissioner, *Davant* "was in an entirely different context than this case. Section 381 was not before the Fifth Circuit and, unfortunately, the legislative evidence presented to the Tax Court and this court was not presented to it." But the Commissioner does not take issue with the "F" reorganization finding in the *Davant* factual context. In effect, he says that an "F" reorganization is one thing when the issue is treatment of gain and another when the issue is loss carryback. The Commissioner's varying position is illustrative of the taxpayer's paradox herein.

Had Stauffer Illinois and Stauffer New York merged into Stauffer California, the last could have carried back a post-merger loss *to one of its own* pre-merger taxable years. Regs. § 1.381(c)(1)–1(b). Or, had Stauffer Illinois and Stauffer New York merged into Stauffer California followed by the acquisition of Stauffer California by Stauffer New Mexico as a subsidiary, a loss sustained by Stauffer California could have been carried back to a pre-acquisition taxable year of Stauffer California. Id. Or, had Stauffer California reincorporated into Stauffer New Mexico and thereafter consummated a merger with Stauffer New York and Stauffer Illinois, a loss sustained by Stauffer New Mexico could have been carried back to a taxable year of Stauffer California. Id. This condition of circumstances has led the petitioner herein to exclaim that she "[H]as been victimized by the old shell game * * * [T]he pea, i. e:, the loss carryback, must be found under one shell or another * * *."

We do not see how the definitive principles of an "F" reorganization can change from one case to another, from one context to another, dependent upon which position the Commissioner of Internal Revenue prefers. While the factual situation which gives rise to a determination in a given case will invariably differ, the standards by which the determination is to be made cannot. An "F" reorganization is just that, and tax consequences flow from that determination, not vice versa.

■ Nor are we persuaded that a different result should have been obtained in *Davant* because of the "legislative evidence" which was not presented to that court but which is before us. The principle we derive from *Davant* is that a shift in operating assets from the transferor corporation to its alter ego wherein the identity of the proprietary interest remains intact and the business enterprise of the transferor corporation continues unimpaired results in an "F" reorganization. There is a change of corporate vehicles but not a change in the substance of the transferor corporation. In *Davant* the change was reflected by the disappearance of the Warehouse stock; the substance of the two pre-merger corporations did not change; the assets of Warehouse were merely reflected in the books of Water and in the increment in the Water stock. In the instant case, the only change that took place was that Stauffer New Mexico reported the combined income of the three pre-merger corporations in one tax return; the individual books of the constituent enterprises were kept as they had been before the merger; the enterprises continued to operate in the same manner and at the same locations as before the merger; the change was one of corporate vehicles only. The Regulations, § 1.381 (b)–1(a) (2), state that in an "F" reorganization the acquiring corporation is to be treated "just as the transferor corporation would have been treated if there had been no reorganization." Thus, the identity of pre- and post-merger entities is so complete that for tax purposes the latter is the former. That Stauffer New Mexico stood in the shoes of each of the three constituent corporations cannot be

here denied; it was the alter ego of each of the three pre-merger entities.

 The Commissioner seeks to defeat such a construction of the facts of this case by arguing the alleged undesirability and unworkability of the tax consequences of such a construction. He contends that if the transaction herein is an "F" reorganization the following anomaly results: § 381(b) would permit Stauffer New Mexico to carry back its post-merger loss to a pre-merger taxable year of the transferor corporations, while § 381(c) (1) (A), which does not exempt the "F" reorganization, would prevent a carryback of a net operating loss of the transferor corporations to a pre-merger year of Stauffer New Mexico. Thus, the Commissioner argues that if Congress had intended the "F" provision to encompass more than a single enterprise it logically would have provided the same exception in § 381(c) (1) (A) as it provided in § 381(b). We believe this argument fails for two reasons. First, and most important, Stauffer New Mexico had no pre-merger taxable year to which *any* loss could have been carried back. This fact strongly indicates that Stauffer New Mexico is nothing more than the alter ego of the three constituent corporations, and further evidences the degree to which it stands in the shoes of the pre-merger corporations. Secondly, we reject the adoption of the negative inversion of § 381(c) (1) (A) suggested in the Commissioner's brief. (Op.Br. p. 28). Reading § 381(c) (1) (A) *as written*, it provides that the pre-merger net operating loss of the transferor corporation may be carried *forward* to a post-merger year of the transferee corporation. Together with § 381(b) (whereby the transferee corporation may carry back a post-merger loss to a pre-merger taxable year of a transferor corporation) it provides the transferee in an "F" reorganization with a most favorable treatment of losses. With tax advantages such as these available to the "F" reorganization, we fail to see an anomaly in the denial of the carryback of the transferor's pre-merger net operating loss to a pre-merger taxable

year of the transferee. As the Commissioner states § 381(c) (1) (A) applies to *all* corporate reorganizations. But that section necessarily applies to multi-corporate reorganizations and can not encompass a uni-corporate reorganizations for in reorganizations of the latter type, under the "F" definition, the transferee corporation would, in every instance, be but a shell corporation organized to reincorporate the transferor and would, consequently, have no pre-merger taxable years to which to carry back a pre-merger net operating loss of the transferor. Consequently, the Commissioner's argument that Congress intended to include uni-corporate reorganizations within the scope of § 381(c) (1) (A) is not convincing. Indeed, assuming that the inverse of § 381(c) (1) (A), as stated by the Commissioner, is a correct statement of the law, and further assuming that Congress sought to limit the "F" reorganization to a single corporation, it surely would have excepted the "F" reorganization from the multi-corporate provisions in § 381(c) (1) (A).

The Commissioner next contends that to permit multi-corporate "F" reorganizations would "make Section 381(b) (1) unworkable and would run counter to the most elementary principles of taxation." We must assume, for purposes of this argument (says the Commissioner) that two of the pre-merger Stauffer companies filed tax returns reporting different fiscal years (contrary to the facts of this case). With this assumption, it can then be seen that under § 381(b) (1), the taxable years of the transferor corporations do not end on the date of the merger, but their income is reported by the transferee corporation at the close of its fiscal year. Consequently, serious questions arise as to how the transferee corporation will treat the varying fiscal year accountabilities of the constituent corporations. The Commissioner would have us dismiss as "pure happenstance" the fact that the three pre-merger Stauffer companies employed the identical fiscal year accounting methods.

We find the Government's argument in this respect to be all the more indicative of the complete identity existent between the three constituent corporations and Stauffer New Mexico. The last corporation, being the alter ego of the transferor corporations, merely assumed their accounting procedures without change. We do not view this as pure happenstance, but as a further indicium of identity consistent with an "F" reorganization. We do not here decide whether different accounting methods by the transferor corporations would disrupt the requisite continuity of the "F" reorganization. But Congress apparently did not regard this as of great significance. (See § 381(c) (4), providing for the post-merger combination of varying accounting procedures).

Having concluded that the merger here in question constituted an "F" reorganization under § 368(a) (1), we turn to the problem of determining the loss which Stauffer New Mexico is entitled to carry back and of determining to which of the three pre-merger corporations the loss may be carried. As discussed, supra, had the merger been effected in a number of other ways, the loss sustained by Stauffer New Mexico, to the extent that it represented the loss of Stauffer California, could have been carried back to a pre-merger taxable year of Stauffer California. *But for* the simultaneous merger of the three corporations, the loss carryback would have been undeniably allowed. This, the Commissioner admits.

Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 597 (1935) teaches that mere compliance with the code provisions resulting in a tax advantage will be sanctioned by the courts only when there is, independent of the tax consequences, business or corporate purpose. The Tax Court found in the case before us, that the merger of the three Stauffer corporations was motivated solely by legitimate business purposes, the consolidation of the operational facilities. Indeed, no losses occurred until after the reorganization. Hence, we are not confronted with purposeful tax avoidance

executed in compliance with the code provisions.

In Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), the Court had before it a case in which 16 separate corporations, engaged in a related business enterprise, were all owned by the same interests. Three of the corporations had sustained continued losses, and in an effort to offset the profits of the prosperous corporations against the losses incurred by these three corporations, a merger was effected. Thereafter, the losses were carried forward to a taxable year of the transferee corporation. The Court used the "but for" rationale, stating, "had there been no merger, these businesses would have had no opportunity to carry over their losses." 353 U.S. at 388, 77 S.Ct. at 994. Distinguished by the Court was the case of Newmarket Mfg. Co. v. United States, 233 F.2d 493 (1st Cir. 1956), where, in an "F" type reorganization (although occurring before the enactment of the 1954 Code) a single corporation reincorporated in another state, with the court remarking, "[B]ut for the [Newmarket] merger, the old corporation itself would have been entitled to a carry-back." 353 U.S. at 388, 77 S.Ct. at 994. See also Casco Products Corp., 49 T.C. 32; and Dunlap & Associates, Inc., 47 T.C. 542 (1967).

In the case before us, the Commissioner has failed "to sustain the contention that the effectuation of this statutory merger * * * defeats the carry-back deduction which would otherwise have been available," in the above hypothetical situations. Newmarket Mfg. Co. v. United States, supra, at 497. The only *fact* which the Commissioner relies upon to defeat the carryback is that the three corporations merged *at the same time*. Under the hypothesis stated, the Stauffer transferee would have been entitled to carry back that portion of the loss attributable to Stauffer California's operations to a pre-merger year of that same corporation. Accordingly, that portion of the losses of Stauffer New Mexico attributable to the operations of Stauffer California, $2,184,689 may be carried

back to a pre-merger taxable year of Stauffer California.

Had the operational facilities of the three pre-merger corporations been dismantled and transported to New Mexico we would have a different situation. Then, the financial status of Stauffer New Mexico would have reflected a single operation. In such case, there would be no means by which a loss could be pro-rated among the pre-merger identities, and the combined losses of what was in fact the consolidation of three companies could not have been set off against the pre-merger income of only one of those companies, for this would have resulted in a windfall to the transferee. The losses of the Illinois and New York corporations could not have been carried back to, or offset by, prior taxable years of the California corporation before the merger, and to permit their combined losses to be so offset after the merger, would accord to the transferee a benefit which would not have been available prior to the merger. However, we emphasize that this is but a problem of tax accountability and does not reflect on our conclusion that the herein transaction was an "F" reorganization.

Lastly, the taxpayer contends that because the refund was paid to Stauffer New Mexico the Commissioner must proceed against that corporation for recovery of the refund and not against Stauffer California, whose tax was assessed as deficient because of the refund paid. She claims that Stauffer New Mexico is a stranger to this proceeding. Our conclusion that the reorganization was of the "F" type disposes of this argument.[8]

As the loss attributable to Stauffer California is not in excess of the refund heretofore paid from the taxable years 1958–59 of Stauffer California, the refund will stand. It was proper for Stauf-

fer New Mexico as the "F" reorganization transferee of the California, Illinois, and New York corporations to consolidate their income for the period February 1, 1959, to September 30, 1959, in its tax return for the fiscal year February 1, 1959, to January 31, 1960. Rev.Rul. 57–276 (1957–1 C.B. 126).

The judgments of the Tax Court upholding the deficiency assesments by the Commissioner are reversed.[9]

8. At oral argument, it was stipulated as follows:
"that if the Court decides that the transaction constituted an "F" reorganization, the Court need not reach the issue concerning whether there was a deficiency with respect to the taxes of Stauffer California."

9. Cf. Associated Mach. v. C.I.R., 403 F.2d 622 (9th Cir. 1968), decided this day.