## SECURITY INDUSTRIAL INSURANCE COMPANY

v.

## UNITED STATES of America
(three cases).

**Mr. E. J. OURSO and Mrs. Marjorie B. Ourso**

v.

## UNITED STATES of America.

Civ. A. Nos. 76–2702, 76–2700, 76–2701 and 76–2703.

United States District Court,
E. D. Louisiana.

Oct. 14, 1981.

F. Kelleher Riess, New Orleans, La., for plaintiff.

Jack D. Warren, Washington, D. C., for defendant.

## MEMORANDUM OPINION

ROBERT F. COLLINS, District Judge.

The above captioned matters were tried to the Court, sitting without a jury, on February 14 and 15, 1980. The trial transcript was filed into the record on March 25, 1980. Post trial briefs were filed in June of 1980. At the trial on the merits, only two of the four above captioned cases were litigated: Civil Action No. 76–2702 and Civil

Action No. 76–2700. In Civil Action No. 76–2702, plaintiff, Security Industrial Insurance Company (Security), seeks a refund from defendant, United States of America, in the amount of $302,791.25 in taxes and interest paid for 1970. These taxes were paid after the Internal Revenue Service (the Service) assessed a deficiency against Security as a transferee of Southern National Life Insurance Company (Southern). In Civil Action No. 76–2700, plaintiff Security seeks a refund from defendant United States of America in the amount of $206,-778.37 in taxes and interest paid for 1971. These taxes were paid after the Service assessed a deficiency against Security as a transferee of Standard Life Insurance Company (Standard). In both of these cases, the Service contends that the businesses of Southern and Standard were terminated. The Service determined that deficiencies existed by including within the taxable income of Southern and Standard the amounts of policyholders' surplus or reserve accounts for the year that these insurance companies were terminated. These deficiencies were then assessed against Security as the eventual transferee of the assets of Southern and Standard. The other two captioned matters, Civil Action No. 76–2701 and Civil Action No. 76–2703, by agreement of counsel, will be assigned to a Magistrate for trial on the merits, after the promulgation of this opinion.

These refund suits arise from a chain of events involving the merger of Southern and Standard into Security. During calendar years 1970 and 1971, plaintiff Security was a wholly owned subsidiary of the Ourso Investment Company (OIC). Security was formed by Mr. E. J. Ourso, in 1948. (Tr. 30.) Security is a stock Louisiana life insurance company which specializes in writing small policies on a home service basis. Security's major marketing thrust is the sale of funeral insurance to provide funds for burial at the death of the insured. (Tr. 31–32.) Under Ourso's leadership, as chief executive officer and majority shareholder, Security grew from its initial capitalization at $10,000.00 to an insurance company with $2,000,000.00 in assets and $2,000,000.00 of premium income in 1970. (Tr. 33.)

Ourso testified that Security pursued a deliberate growth strategy from 1948 through 1970, resulting in the acquisition of approximately thirty rival insurance companies. (Tr. 38.) Security's growth strategy emphasized acquisition of rivals with narrow premium and sales bases, provided that adequate surpluses or reserves existed. This information was available to the public because the State Insurance Commissioner is required by law to issue a detailed and comprehensive annual report on each insurance company doing business within the State of Louisiana. (Tr. 34–36.) After acquisition, the purchased company was merged into Security. The acquisition of the purchased company was always a taxable event. Prior to the merger of Southern and Standard into Security, in 1970 and 1971, the Service had not taxed Security as a transferee. Thus, Security's customary method of growth was to identify a rival insurance company, purchase that rival company's stock in a transaction fully taxable to the shareholders of the rival company, and then merge the rival into Security.

In the summer of 1970, a pivotal event occurred. The President of Southern died, leaving 24% of Southern's stock to his widow. Security had previously considered acquiring Southern, because Southern fit Security's acquisition profile: Southern's sales and premium bases were narrow, but its reserve or surplus was excellent. (Tr. 35–36.) In Security's analysis, Southern was an insurance company similar in size to Security, but Southern possessed greater assets. Security decided to acquire the stock of Southern hoping to pay approximately $2,500,000.00 for the shares. An effort was made to borrow this amount of money from banks in Baton Rouge. It was determined that Security could not borrow the money because it showed a deficit in its insurance accounting. At this point, the banks required the formation of a holding company which would hold all the stock of Security and Southern, after the acquisition of Southern. As collateral for the loan, the bank requested the stock of Security, the

stock of the holding company, and the personal signature of E. J. Ourso. (Tr. 40–41.) In response to these preconditions for obtaining finance, the OIC was formed in the autumn of 1970.

OIC was formed by the shareholders of Security. These shareholders traded their stock in Security, one for one for stock in OIC. OIC was principally a holding company. Its assets, other than holding shares of other corporations, consisted of funeral homes, real estate, and other securities which could not be owned by insurance companies. OIC became the parent corporation of Security, and Security became a wholly owned subsidiary of OIC. The Court specifically finds that no tax avoidance motives prompted the formation of OIC. Instead, OIC was organized and founded as a holding company and as a corporate device to enable Security to obtain financing for continued growth by acquisition of rival insurance companies.

The purchase of Southern's stock by OIC was consummated in December of 1970 and January of 1971. See Exhs. D–11, D–16, P–44, P–50. After OIC acquired the stock of Southern, Southern was a wholly owned subsidiary of OIC. The purchase of Southern's stock by OIC was a fully taxable event to the shareholders of Southern. (Tr. 178, 199, 220.) Prior to OIC's purchase of Southern's stock, there was no binding commitment to merge Southern with Security, nor was there a definite commitment to liquidate Southern. These decisions rested upon variables that OIC had not investigated at that time. (Tr. 50–51, 54–55.) After the completion of its investigation, OIC liquidated Southern and merged it with Security. The business reason for this corporate reorganization was to realize economies through more efficient management of the two insurance companies. (Tr. 51.) No gain or loss was recognized by Southern, Security, or OIC as a consequence of Southern's liquidation and merger with Security. The Court further finds that there were no tax avoidance motives for the liquidation of Southern and its eventual merger into Security. Southern was formally dissolved on December 7, 1971. See Exh. D–20.

As part of Security's continued growth strategy, Security began efforts to acquire Standard during the summer and autumn of 1971. Standard presented the same combination of attributes that made the acquisition of Southern attractive: Standard had a narrow policy and sales base coupled with an adequate surplus or reserve account. To effect the purchase of Standard, it was necessary to obtain financing in the amount of $3,500,000.00. OIC borrowed this amount from two different banks and consolidated its earlier loans from the acquisition of Southern. OIC's offer to purchase the stock of Standard was accepted by the President of Standard on October 14, 1971. See Exh. D–21. The sale of Standard's stock to OIC was a fully taxable event to Standard's shareholders. Once the acquisition was consummated, Standard became a wholly owned subsidiary of OIC.

Although OIC eventually liquidated Standard and merged it with Security, the liquidation and merger were in no way foreordained at the time OIC acquired Standard. The acquisition of Standard presented greater problems than the prior acquisition of Southern, because Standard was owned and operated by black executives, and the policyholders were predominantly black. Ourso testified that to his knowledge, acquisitions of black insurance companies by white insurance companies were generally unsuccessful. (Tr. 62.) Additionally, OIC had to investigate Standard's surplus or reserve account to determine whether it was adequately funded by sound securities. Only after a thorough analysis of the condition of Standard did OIC decide to liquidate Standard and merge Standard into Security. The decision to liquidate and merge was prompted by considerations of effecting business economics and making the overall operation more efficient. The Court finds that no gain or loss was recognized by Standard, Security, or OIC as a consequence of Standard's liquidation and merger with Security. Standard was formally dissolved on May 8, 1972. See Exh. D–34.

After the liquidation of Southern and Standard, their business operations did not

cease. Instead, their business operations continued under the auspices of Security. Security took over the insurance policies of Southern and Standard and their contracts with funeral directors. Additionally, the clerical personnel and the district offices of the acquired companies were retained by Security. (Tr. 56–57). All of the personnel from Southern and Standard who remained with Security were compensated at the same rate as Security personnel. (Tr. 67–68.) Ourso testified it was his intention to keep the business of Southern and Standard in effect. (Tr. 70.) The Court finds that Ourso was successful in that endeavor. The Court can perceive no change in the business carried on by Southern and Standard after the merger with Security. The Court finds that the businesses of the acquired companies changed only in the sense that their corporate structures were altered. No actual change was effected in the mechanics of the way Southern and Standard operated.

On June 23, 1975, the Service officially notified Security of the assessment of deficiencies as a result of the dissolution of Southern and Standard. See Exhs. D–66, D–67. The Service contended that Southern terminated operations in 1971. In computing the amount of tax due, the Service augmented Southern's taxable income for tax year 1970 by $482,065.00. That amount represents the policyholders' surplus or reserve account, maintained by Southern as required by state law. See Exh. D–66. The Service made a similar determination as to Standard, contending that Standard terminated operations in 1972. In computing the amount of tax due, the Service augmented Standard's taxable income for tax year 1971 by $460,085.00. That amount represents the policyholders' surplus or reserve account, maintained by Standard as required by state law. See Exh. D–67. Security, as the transferee of Southern and Standard, see Exh. D–46, paid the additional taxes plus interest. The parties stipulate that all the procedural prerequisites relevant to the assessment and collection of taxes and interest have been met. The parties have further stipulated that all the

underlying procedural steps necessary to institute these tax refund actions have been complied with. See Pretrial Order, ¶ 7. Accordingly, the Court holds that it has subject matter jurisdiction over these actions, 28 U.S.C. § 1346(a)(1). The Court further holds that venue is properly laid in the Eastern District of Louisiana because the principal place of business of the corporate plaintiff is in this district. 28 U.S.C. § 1402(a)(2).

The taxation of life insurance companies is afforded special treatment in the Internal Revenue Code of 1954. See Internal Revenue Code of 1954, Subchapter L, 26 U.S.C. §§ 801–844. (As used hereinafter, the word "Section" followed by a number refers to the number of a section of the Internal Revenue Code of 1954.) Congress recognized that life insurance companies must maintain policyholders' surplus or reserve accounts, so that the insurance company can pay out claims at the death of an insured. In recognition of this factor, in determining the taxable income of a life insurance company, an amount representing the policyholders' surplus account may be deducted. See Sections 802(b)(3); 815(c). In the instant cases, the Service determined that Southern and Standard terminated operation as life insurance companies. Pursuant to Section 815(d)(2)(A), amounts deducted in prior tax years by Southern and Standard, representing policyholders' surplus, as defined in Sections 802(b)(3), 815(c), were added to the taxable income of these companies, and the Service assessed these amounts as deficiencies against Security.

Security argues that the Service erred in assessing these deficiencies. Security argues that the business of Southern and Standard were not terminated and that the business of Southern and Standard survived the liquidation. Security contends that the liquidation of Southern and Standard were corporate reorganizations (hereinafter referred to as a Type F reorganization), as defined in Section 368(a)(1)(F): "... [T]he term 'reorganization' means ... a mere change in identity, form, or place of organization, however effected." If characterized

as Type F reorganization, certain benefits accrue to Security pursuant to Section 381(a)(2), (c)(22). Generally, Section 381(a)(2), (c)(22) provides that a successor insurance company which emerges from a Type F reorganization retains the tax advantages granted to the predecessor insurance company, as identified in Subchapter L of the Internal Revenue Code, specifically Sections 802(b)(3) and 815(c). Thus, if counsel for Security demonstrates that the liquidation of Southern and Standard are Type F reorganizations, the tax deductions granted to Southern and Standard for their policyholders' surplus accounts accrue to Security, and the deficiencies assessed by the Service are incorrect. Counsel for plaintiff has also urged other theories challenging the legality of the tax assessment. The Court, however, is of the opinion that the liquidation and subsequent merger of Southern and Standard into Security represent Type F reorganizations. This determination is dispositive of the other issues raised by counsel.

A Type F reorganization is defined as "a mere change in identity, form, or place of organization, however effected." Section 368(a)(1)(F). The landmark case of *Davant v. C.I.R.*, 366 F.2d 874 (5th Cir. 1966), *cert. den.*, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967) (*Davant*), established a theoretical framework adopted in the subsequent jurisprudence construing tax issues arising under Section 368(a)(1)(F):

> The term "mere change in identity [or] form" obviously refers to a situation which represents a mere change in *form* as opposed to a change in substance. Whatever the outer limits of section 368(a)(1)(F), it can clearly be applied where the corporate enterprise continues uninterrupted, except for a distribution of some liquid assets or cash. Under such circumstances, there is a change of corporate vehicles but not a change in substance.

*Davant*, 366 F.2d at 884.

The *Davant* opinion represents the initial liberal judicial application of Section 368(a)(1)(F) to corporate reorganizations, with the Service emerging as the beneficiary of the Court's liberal construction. In that case, shareholders of a corporation attempted to remove money from the corporation at capital gains rates. The shareholders sold their stock to the son of their corporate counsel. The son then sold the stock to a second corporation owned and controlled by the same shareholders. Both corporations were engaged in the same business, and no business disruption was effected. The Fifth Circuit panel found: "Every part of the [sold] business was carried on as before with the sole change being that it was necessary to keep one less set of books at the office." *Davant*, 366 F.2d at 879. The panel concluded that the transaction was a Type F reorganization and that the income received from the sale of the stock of the first corporation was dividend income pursuant to Sections 301 and 316. Thus, by emphasizing the substance, rather than the form of the transaction, the Court frustrated the taxpayers' efforts to remove corporate assets from the corporation at capital gains rates.

In the *Estate of Stauffer v. C.I.R.*, 403 F.2d 611 (9th Cir. 1968) (*Stauffer*), the Ninth Circuit Court of Appeals adopted the *Davant* analysis of Type F reorganizations, to the benefit of the taxpayer. In *Stauffer*, the taxpayer set up three corporations, each in different states. The taxpayer then merged these corporations (transferor corporations) into a fourth corporation. When business faltered, the taxpayer attempted to carry back its net operating loss to the taxable years of its transferor corporations, alleging that the merger of these corporations represented a Type F reorganization. The Ninth Circuit panel agreed. Relying on *Davant*, the *Stauffer* panel stated:

> The principle we derive from *Davant* is that a shift in operating assets from the transferor corporation to its alter ego wherein the identity of the proprietary interest remains intact and the business enterprise of the transferor corporation continues unimpaired results in an "F" reorganization. There is a change of corporate vehicles but not a change in the substance of the transferor corporation.

*Stauffer*, 403 F.2d at 619.

Applying the principle derived from *Davant*, the panel concluded:

> In the instant case, the only change that took place was that Stauffer New Mexico reported the combined income of the three pre-merger corporations in one tax return; the individual books of the constituent enterprises were kept as they had been before the merger; the enterprises continued to operate in the same manner and at the same locations as before the merger; the change was one of corporate vehicles only.

> *Stauffer*, 403 F.2d at 619.

*Stauffer* is significant because it applied a Type F reorganization analysis to several corporations.

The Fifth Circuit further expanded the number of corporations which, upon merger into one corporation, constituted a Type F reorganization. In *Home Construction Corporation of America v. United States*, 439 F.2d 1165 (5th Cir. 1971) (*Home Construction*), 123 separate corporations, owned by the same shareholder, were consolidated into one corporation. The panel found that the same business activities which the 123 corporations had conducted were carried on by the unified corporation. The taxpayer was assessed with deficiencies when the corporation attempted to take advantage of tax carry backs in the previous year from some of the 123 corporations. The Fifth Circuit held that the taxpayer had successfully implemented a Type F reorganization, and held that the taxpayer was entitled to a refund. In its analysis of Section 368 reorganizations, the panel isolated asset continuity as an important factor:

> [T]he underlying purpose and the quality which characterizes all § 368 reorganizations is asset continuity, meaning that the assets of the new entity subsist and are utilized in a manner which is substantially a continuation of the existence and use made of such assets by the former entity or entities.

> *Home Construction*, 439 F.2d at 1168.

Again placing heavy emphasis upon substance over form, the panel found that the facts in *Home Construction* satisfied the criteria set forth in *Davant* for a Type F reorganization:

> In summary, we hold that *Davant* establishes criteria which adequately define when a reorganization qualifies as a mere change in form, identity, or place of incorporation. These include identity of shareholders and their proprietary interests, unimpaired continuity of the essential business enterprise and a new form which is the alter ego of the old. While the instant reorganization was more complex, it still meets all the criteria established by *Davant*. It therefore was an F reorganization.

> *Home Construction*, 439 F.2d at 1170.

The *Home Construction* panel then went on to consider the limitations placed upon a Type F reorganization. The panel held that the following factors must be present to constitute a Type F reorganization: there must be a merger of commonly owned corporations, engaged in the same or integrated activities, there must be continuity in all matters of business substance, and there must be a legitimate business purpose, above and beyond the favorable tax consequences that may result from a Type F reorganization. *Home Construction*, 439 F.2d at 1171–72.

In 1974, the Court of Claims and the Sixth Circuit, relying on *Davant*, *Stauffer*, and *Home Construction*, promulgated opinions sanctioning Type F reorganizations where wholly owned subsidiaries were merged into their parent corporations. *Movielab, Inc. v. United States*, 494 F.2d 693 (Ct.Cl.1974) (*Movielab*); *Performance Systems, Inc. v. United States*, 501 F.2d 1338 (6th Cir. 1974) (affirming 382 F.Supp. 525 (M.D.Tenn.1973)). In discussing the application of Section 368(a)(1)(F) to a merger of a wholly owned subsidiary into its parent corporation, the Court of Claims made the following observations:

> So long as the reorganization is characterized by an identity of shareholders and their proprietary interests, as well as unimpaired continuity in the essential business enterprise, the new form will be the

alter ego of the old. The change which results will, by definition, be one of mere form.

The fact-pattern of the instant case presents an even more clear cut example of a formalistic change made merely to simplify bookkeeping and administration. Except for the fact that the business of Color ceased to be conducted in the separate context of a subsidiary, and instead became one aspect of Movielab, no changes occurred on the day following the merger. The same business was being conducted—without interruption—at the same location, by the same management and for the same proprietary interests.

*Movielab,* 494 F.2d at 699 (footnotes omitted).

In *Performance Systems,* the district court and the Sixth Circuit reached the same result as the Court of Claims. The case arose after the merger of a wholly owned subsidiary into its parent corporation. The district court found that "the surviving parent corporation continued to perform both the business which had been previously carried on by the parent corporation and also that business which had been previously carried on by the subsidiary." *Performance Systems,* 382 F.Supp. 525, 527 (M.D.Tenn.1973), *affirmed* 501 F.2d 1338 (6th Cir. 1974). The district court therefore concluded that the merger was a Type F reorganization.

In *Revenue Ruling* 75–561, the Service retreated from its prior position, *Rev.Rul.* 69–185, which announced the Service's decision not to follow *Davant* and *Stauffer.* Citing *Davant, Stauffer, Home Construction, Movielab,* and *Performance Systems,* the Service promulgated the following requirements for recognition of a Type F reorganization:

(1) There must be complete identity of shareholders and their proprietary interests in the transferor corporations and acquiring corporations. In the case of wholly-owned subsidiary-into-parent merger, this requirement will be deemed to be satisfied when the shareholders and their proprietary interests in the parent do not change as a result of the merger;

(2) The transferor corporations and the acquiring corporation must be engaged in the same business activities or integrated activities before the combination; and,

(3) The business enterprise of the transferor corporations and the acquiring corporation must continue unchanged after the combination.

*Rev.Rul.* 75–561.

The Court is of the opinion that the cases of *Davant, Stauffer, Home Construction, Movielab,* and *Performance Systems* are controlling herein. The Court holds that the facts of the instant cases show that Southern, Standard, and Security all shared a common identity of shareholders possessing the same proprietary interests. Through the medium of a holding company, OIC, the Ourso family owned the stock of all three of these insurance companies. The Court further holds that an unimpaired continuity in the essential business enterprise existed after Southern and Standard were merged into Security. Security continued to honor life insurance policies held by clients of Southern and Standard. Security continued to service the accounts of these clients and endeavored to sell these clients other insurance benefits, as Southern and Standard would have done. Further, Security honored commitments previously agreed to by Southern and Standard in relation to contracts signed by the transferor insurance companies with funeral homes. The Court is of the opinion that the merger of the three insurance companies represents a "change of corporate vehicles but not a change in the substance of the transferor corporation[s]." *Stauffer,* 409 F.2d at 619. Testimony in the record also demonstrates that the field offices of the transferor companies were maintained, as well as much of the administrative and clerical personnel. *Movielab,* 494 F.2d at 699. The Court also holds that Security, the transferee corporation, carried on its business and the business of the transferors without interruption. *Performance Systems,* 382 F.Supp. at 527.

In the Court's analysis of the facts presented in the instant cases, it is instructive to consider the limitations, upon recognition of a Type F reorganization, identified in *Home Construction.* The Fifth Circuit noted that "*Davant* and *Stauffer* are limited to the merger of commonly owned corporations engaged in the same or integrated activities." *Home Construction,* 439 F.2d at 1171. These criteria are clearly satisfied herein. The Ourso family, through the corporate device of OIC, commonly owned Southern, Standard, and Security. All three companies were engaged in the same activity, the selling of life and funeral insurance. There was a continuity of the business of Southern and Standard when they were merged with Security. *Home Construction,* 439 F.2d at 1172. Finally, there was a legitimate business purpose for the consolidation of the three companies: increased efficiency and reduction of overhead. *Home Construction,* 439 F.2d at 1172. Hence, the Court concludes that the limitations upon a Type F reorganization have been met in the instant cases.

The Court is cognizant of the fact that the consolidation of Security, Southern, and Standard, does not exactly match the facts of *Movielab* and *Performance Systems.* In the latter cases, the wholly owned subsidiaries were merged into the parent corporation, whereas in the instant cases, the parent caused two subsidiaries to be merged into a third subsidiary. The Court considers this factor to be of no consequence in this case, bearing in mind the essential principle of tax jurisprudence: the substance of a transaction is of greater significance than the form in which the transaction is characterized. It must be emphasized that in these cases, OIC was formed for the purpose of borrowing funds, because Security, as an insurance company, could not show deficits in the policyholders' surplus account. Thus, the fact that the parent company caused two of its subsidiaries to be merged into its largest subsidiary is of no moment, given the factual reason why OIC was necessary as a parent company. In substance, Security was and is the parent company, but as a matter of form, to obtain financing and to avoid impairing Security's policyholders' surplus, OIC, a holding company, was set up as the parent company. This single factor, when weighed against the factors proved at trial, demonstrating a Type F reorganization, will not prevent the Court from applying Section 368(a)(1)(F) to the transactions at issue.

For these reasons, the Court will enter Judgment in Civil Action No. 76–2702 in favor of plaintiff, Security Industrial Insurance Company, and against defendant, United States of America, in the true and full sum of $302,791.25, plus interest as provided by law, all costs taxed to the defendant. The Court will further enter Judgment in Civil Action No. 76–2700 in favor of plaintiff, Security Industrial Insurance Company, and against the defendant, United States of America, in the true and full sum of $206,778.37, plus interest as provided by law, all costs taxed to the defendant.