ROMY HAMMES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7444–73. Filed September 13, 1977.

*Charles M. Boynton,* for the petitioner.
*James F. Hanley, Jr.,* for the respondent.

WILBUR, *Judge:* Respondent has determined a deficiency in petitioner's Federal income tax for the taxable year 1967 in the amount of $19,210.85. The issue for decision is whether petitioner, as successor by merger, is entitled to carry back a portion of its net operating loss to the 1967 premerger income of Romy Hammes, Inc., an Illinois corporation. The resolution of this issue depends largely on whether the multicorporate merger in 1967, of which petitioner is the surviving corporation, qualified as a reorganization under the provisions of section 368(a)(1)(F).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Romy Hammes, Inc. (hereinafter referred to as Nevada), was organized under the laws of the State of Nevada on May 7, 1951, and conducted its business from its principal office in Kankakee, Ill., where it maintained its books and records at the time of filing the petition herein.

Nevada was inactive until December 15, 1967, at which time Romy Hammes (Romy) transferred certain of his assets and liabilities having a net asset value of $350,000 to Nevada in exchange for its initial issue of 3,500 shares.

On December 29, 1967, the following four operating corporations entered into a merger agreement with Nevada for the purposes of merging these corporations into Nevada:

(1) Romy Hammes Co., Inc., an Indiana corporation (Company);

(2) Romy Hammes Corp., an Indiana corporation (Corporation);

(3) Hammes Enterprises, Inc., an Illinois corporation (Enterprises);

(4) Romy Hammes, Inc., an Illinois corporation (Illinois).

Company was organized and incorporated in Indiana on June 17, 1946. It acquired the Singer property located in South Bend, Ind., in 1955 which consisted of approximately 50 acres and which had been used as a woodworking facility for the Singer Co. Company then tore down the brick and frame

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

buildings but left the reinforced concrete building which was converted into office and warehouse space which it rented. In addition, it constructed an A & P store which it rented under a long-term lease and a one-floor retail facility which it held for rent. On the Singer property it also constructed an automobile agency facility which it rented to Corporation. It conducted and managed the Maytag appliance franchise for Indiana and Michigan. Company's income was derived from the rental properties and from the sale of Maytag appliances to dealers in Indiana and Michigan under its franchise agreement with the Maytag Co.

Corporation was organized and incorporated under the laws of the State of Indiana on July 22, 1950, and operated, managed, and engaged in the business of the sale of Ford Motor products in South Bend, Ind. It operated the dealership which sold at retail Ford automobiles and trucks and tractors. It was located at 244 South Olive Street, South Bend, Ind., and leased its premises from Company which owned the real estate. The dealership was sold in 1974.

Enterprises was organized and incorporated in Illinois on July 1, 1946, to deal in real estate. It acquired land and caused to have constructed commercial buildings in the area of Kankakee, Ill., which it leased. On February 6, 1962, Romy Hammes Homes, Inc., an Illinois corporation, (Homes-Kankakee) was merged into Enterprises. Prior to the merger, Homes-Kankakee had built homes for rent and sale in Kankakee, Ill. Among the assets transferred to Enterprises as a result of the merger were the rental houses and the installment contracts on the homes previously built and sold by Homes-Kankakee.

Illinois was organized under the laws of the State of Illinois on July 2, 1946. Prior to its 1968 merger into Nevada, Illinois constructed, then rented, various commercial buildings, among them a shopping center in Joliet, Ill.[2]

The shareholders of the merging corporations and the survivor, Nevada, as of December 29, 1967, were as follows:[3]

---

[2] On Apr. 12, 1961, three Illinois corporations, Romy Hammes Sales, Inc., Romy Hammes Joliet-Homes, Inc., and Hammes Leasing Corp. were merged into Illinois.

[3] In addition to the shares shown on this chart as of Dec. 29, 1967, Company had 415 shares of treasury stock, Enterprises had 36 shares of treasury stock, and Illinois

|  | Shares |
|---|---|
| **(1) Nevada** | |
| Romy Hammes | 3,500 |
| **(2) Company** | |
| Romy Hammes | 179¼ |
| Gerald Hammes | 124 |
| Romy Hammes Trust | 726¾ |
| **(3) Corporation** | |
| Romy Hammes | 4,000 |
| Gerald Hammes | 1,000 |
| 30 Employees | 590 |
| **(4) Enterprises** | |
| Romy Hammes | 1,589½ |
| Gerald Hammes | 575 |
| Romy Hammes Trust | 335½ |
| **(5) Illinois** | |
| Romy Hammes | 1,112½ |
| Gerald Hammes | 200 |
| Romy Hammes Trust | 383½ |
| Hammes Enterprises, Inc. | 400 |

Eighteen of the individual employee shareholders of Corporation did not desire to go along with the merger and, prior to the finalization of the merger, Corporation redeemed 155 shares of Corporation stock from the dissenting shareholders for a total purchase price of $3,467.

Upon the merger of the four corporations into Nevada, the survivor issued its stock as follows:[4]

| | |
|---|---|
| Romy Hammes | 25,340 |
| Gerald Hammes | 8,078 |
| Romy Hammes Trust | 9,668 |
| Hammes Enterprises, Inc. | [5]2,052 |
| Harry Greer | 171.47 |
| Floyd Parisot | 47.63 |
| Mrs. Don L. Cira | 47.63 |
| Mr. and Mrs. Wesley D. Glaser, Jr. | 33.34 |
| Mrs. Harvey Sult | 23.81 |
| Mr. and Mrs. Fred A. Root | 23.81 |
| Mr. and Mrs. Harold J. Smith | 23.81 |
| Mr. and Mrs. Hubert Stults | 19.05 |
| Mr. Carl A. Weinzetl | 9.53 |

had 8 shares of treasury stock.

[4] Harry Greer, Floyd Parisot, Mrs. Don L. Cira, Mr. and Mrs. Wesley D. Glaser, Jr., Mrs. Harvey Sult, Mr. and Mrs. Fred A. Root, Mr. and Mrs. Harold J. Smith, Mr. and Mrs. Hubert Stults, Mr. Carl A. Weinzetl, Mr. and Mrs. A.J. Hoerstman, Mr. and Mrs. Merle A. Durbin, and Mr. and Mrs. John C. Lenko are the remaining shareholders of the original 30 employee shareholders of Corporation who maintained their ownership in the merged Nevada.

[5] Common stock certificate number 5 representing 2,052 shares of stock in Nevada, was issued in the name of Hammes Enterprises, Inc., and was treated by Nevada as treasury stock.

| | |
|---|---|
| Mr. and Mrs. A. J. Hoerstman | 4.76 |
| Mr. and Mrs. Merle A. Durbin | 4.76 |
| Mr. and Mrs. John C. Lenko | 4.76 |
| The Romy Hammes Corp | [6]147.64 |

Thirty-five hundred shares had previously been issued to Romy.

The stock holdings in Nevada were arrived at by first determining the net worth of Corporation, Company, Enterprises, and Illinois on the basis of book value as of December 27, 1967. These figures were then used to determine the respective values per share of each of the four corporations. The holders of these shares were given an equivalent equity interest in Nevada.

After the merger, the merging corporations were designated as divisions, and each kept separate books and records to reflect its continuing operations. In addition, Nevada kept two more sets of divisional books and records; one for the operation of its Hawaiian project and one for the rest of Nevada's assets which were transferred by Romy to Nevada on December 15, 1967. Finally, Nevada kept a consolidated account which reflected the total operations of all divisions.

In 1965, Romy, in his individual capacity, and Bruce McNeil (McNeil) acquired an option on a sublease of an existing four-story structure in Honolulu, Hawaii, with the intent to build a hotel over the existing structure. The construction was to be done by the McNeil Construction Co. On August 26, 1966, the option lapsed but McNeil and Romy obtained a new option on the subleasehold from Standard Oil of California on March 12, 1968. In June 1968, they exercised the option and acquired the subleasehold.

Romy had transferred his interest in the Hawaiian transaction to Nevada as part of the net asset transfer from Romy to Nevada on December 15, 1967, for which he received the initial issue of Nevada's common stock.

Nevada's original intent was to maintain ownership of the hotel, and have it managed by Hyatt Corp., but Nevada

---

[6] Common stock certificate number 19 of Nevada, representing 147.64 shares was issued in the name of Romy Hammes Corp. and was treated by Nevada as treasury stock. These shares resulted from the redemption by Corporation of its own 155 shares of stock which it redeemed from its dissenting shareholder employees before its merger into Nevada.

subsequently decided to sell the project. On March 29, 1969, while the hotel was still under construction, Cinerama, Inc., a New York corporation, agreed to buy the hotel. The hotel was constructed and nearing completion, when on February 27, 1970, a fire took place in the upper stories and Cinerama, Inc., refused to go through with the purchase. The operation of the hotel from March 1970 through the end of the year resulted in a loss sufficient to offset all of Nevada's other taxable income and still produce Nevada's net operating loss for 1970 of $735,859. Nevada filed an application for a tentative refund (Form 1139) from a carryback of its 1970 net operating loss to Illinois' 1967 taxable year in which Illinois had premerger taxable income of $50,439. At the time of the application for the carryback, Illinois had been merged into Nevada. On December 29, 1971, a tentative carryback allowance was made to Nevada in the amount of $19,211.12.

## OPINION

The sole issue to be decided is whether Nevada is entitled to carry back its 1970 net operating loss to the 1967 premerger income of Illinois.

Section 381(b)(3)[7] provides that the acquiring corporation in certain described reorganizations shall not be entitled to carry back a post-reorganization net operating loss to a taxable year of a transferor corporation. This carryback prohibition, however, does not apply "in the case of an acquisition in connection with a reorganization described in subparagraph (F) of section 368(a)(1)." Petitioner contends that the merger of Company, Corporation, Enterprises, and Illinois into Nevada was an (F) reorganization, and that Nevada, as the acquiring corporation, is entitled to carry back its net operating loss to the premerger income of Illinois.

An (F) reorganization is one of the six types of reorganizations described in section 368(a)(1). The (F) reorganization is defined as "a mere change in identity, form or place of

---

[7] SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(b) OPERATING RULES.—Except in the case of an acquisition in connection with a reorganization described in subparagraph (F) of section 368(a)(1)—
    * * *
    (3) The corporation acquiring property in a distribution or transfer described in subsection (a) shall not be entitled to carry back a net operating loss or a net capital loss for a taxable year ending after the date of distribution or transfer to a taxable year of the distributor or transferor corporation.

organization, however effected." We note at the outset that the language of the statute and the legislative history of the reorganization provisions[8] strongly suggest that (F) reorganizations were meant to be limited to only minor corporate adjustments.

The tax-free treatment accorded to the reorganizations described in section 368(a)(1)(A) through (F) is rooted in the philosophy that where there is a sufficient degree of continuity in the business enterprise, the corporate adjustment will be an inappropriate occasion for the reckoning of gain or loss on the taxpayer's investment. As noted in section 1.1002–1(c), Income Tax Regs., the underlying assumption behind such treatment "is that the new property is substantially a continuation of the old investment still unliquidated; and, in the case of reorganizations, that the new enterprise, the new

---

[8] The definition of what is now an (F) reorganization has been included in the income tax statutes since the Revenue Act of 1921. It has been suggested that the provision was enacted to provide for situations similar to that presented by *Marr v. United States,* 268 U.S. 536 (1925), in which it was held that the reincorporation of General Motors Corp. in another State was a taxable transaction. Paul, Studies in Federal Taxation 82 (3d series, 1940). See also *United States v. Phellis,* 257 U.S. 156 (1921).

The (F) reorganization was defined in sec. 202(c)(2) of the Revenue Act of 1921 as a "mere change in identity, form or place of organization of a corporation (however effected)." When the subsection was revised by the Revenue Act of 1924, sec. 203(h)(1)(D), the words "of a corporation" were dropped. The statutory definition of the (F) reorganization was otherwise identical, and the House report explained that the deletion was part of certain "minor changes in phraseology." H. Rept. 179, 68th Cong., 1st Sess. 13 (1924).

The (F) reorganization received relatively little judicial or administrative attention until respondent began to use the (F) reorganization as a weapon in the liquidation-reincorporation area. See, e.g., *Davant v. Commissioner,* 366 F.2d 874 (5th Cir. 1966), cert. denied, 386 U.S. 1022 (1967); *Reef Corp. v. Commissioner,* 368 F.2d 125 (5th Cir. 1966), cert. denied 386 U.S. 1018 (1967); *Berghash v. Commissioner,* 43 T.C. 743 (1965), affd. 361 F.2d 257 (2d Cir. 1966); *Pridemark, Inc. v. Commissioner,* 42 T.C. 510 (1964), revd. in part 345 F.2d 35 (4th Cir. 1965).

Although the litigating positions of the Service and the taxpayer are reversed when the scope of the (F) reorganization is to be determined for purposes of the sec. 381(b)(3) loss carryback, the judicial interpretation of 368(a)(1)(F) must obviously be consistent.

For further discussions on the emergence of the (F) reorganization see generally Pugh, "The F Reorganization: Reveille for a Sleeping Giant?" 24 Tax L. Rev. 437 (1969); Comments, "(F) Reorganizations and Proposed Alternate Routes for Post-Reorganization Net Operating Loss Carrybacks," 66 Mich. L. Rev. 498 (1968); Comments, "Section 368(a)(1)(F) and Loss Carrybacks in Corporate Reorganizations," 117 U. Pa. L. Rev. 764 (1969).

corporate structure, and the new property are substantially continuations of the old still unliquidated."

In addition to the question whether gain or loss should be recognized, other problems surface in the corporate reorganization. One of the most prominent of these difficulties is the determination of the extent to which corporate characteristics should be carried over from the old business enterprise to the new. Congress provided in section 381 that in the case of certain tax-free acquisitions, the acquiring corporation would succeed and take into account such corporate attributes of the transferor as net operating loss carryovers, earnings and profits, methods of accounting, and basis in inventory. Many of these items[9] are described in section 381(c), together with the limitations and conditions on each.

In section 381(b), Congress precluded the continuity of certain items. Thus, except in the case of an (F) reorganization, section 381(b)(1) provides that the taxable year of the transferor corporation shall end on the date of distribution, and section 381(b)(3) (with which we are here concerned) prohibits the acquiring corporation from carrying back a postmerger net operating loss to a taxable year of the transferor.

In enacting section 381(b)(3), therefore, Congress was generally unwilling to allow the carryback described therein, despite the continuity of business enterprise present in all qualifying reorganizations. The theory behind exempting (F) reorganizations from this carryback prohibition is that the change between the old and the new enterprises is so inconsequential in the (F) reorganization that the acquiring corporation should be treated as if no reorganization had taken place. This view is reflected in the section 381 regulations:

Sec. 1.381(b)–1. Operating rules applicable to carryovers in certain corporate acquisitions.

(2) *Reorganizations under section 368(a)(1)(F).* In the case of a reorganization qualifying under section 368(a)(1)(F) (whether or not such reorganization also qualifies under any other provision of section 368(a)(1)), *the acquiring corporation shall be treated (for purposes of section 381) just as the*

---

[9] The list of items described in sec. 381(c) is not meant to be all inclusive. See H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591) 83d Cong., 2d Sess. A135 (1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 277 (1954).

*transferor corporation would have been treated if there had been no reorganization.* Thus, the taxable year of the transferor corporation shall not end on the date of transfer merely because of the transfer; a net operating loss of the acquiring corporation for any taxable year ending after the date of transfer shall be carried back in accordance with section 172(b) in computing the taxable income of the transferor corporation for a taxable year ending before the date of transfer; and the tax attributes of the transferor corporation enumerated in section 381(c) shall be taken into account by the acquiring corporation as if there had been no reorganization. [Emphasis added.]

The comparatively minor role envisioned for (F) reorganizations is underscored by the fact that the House recommended it be dropped from the proposed 1954 Code as unnecessary since the minor corporate adjustments it permitted could be accomplished by other reorganization provisions.[10] The provision was retained, however, after it was pointed out in the Senate hearings by representatives of the tax bar that certain reincorporations of the same corporate business in another State might still require the (F) reorganization for tax-free treatment.[11]

Against this background, prior decisions of this Court concurred in respondent's view that the merger of two or more operating companies could not meet the definition of a reorganization under section 368(a)(1)(F). *Estate of Stauffer v. Commissioner,* 48 T.C. 277 (1967), revd. 403 F.2d 611 (9th Cir. 1968); *Associated Machine v. Commissioner,* 48 T.C. 318 (1967), revd. 403 F.2d 622 (9th Cir. 1968).

In view of an avalanche of subsequent decisions to the contrary, including decisions by the Fifth, Sixth, and Ninth Circuit Courts of Appeals, and the Court of Claims (*Estate of Stauffer v. Commissioner,* 403 F.2d 611 (9th Cir. 1968); *Associated Machine v. Commissioner,* 403 F.2d 622 (9th Cir. 1968); *Davant v. Commissioner,* 366 F.2d 874 (5th Cir. 1966), cert. denied 386 U.S. 1022 (1967); *Home Construction Corp. of America v. United States,* 439 F.2d 1165 (5th Cir. 1971); *Movielab, Inc. v. United States,* 494 F.2d 693 (Ct. Cl. 1974); *Performance Systems, Inc. v. United States,* 382 F. Supp. 525 (M.D. Tenn. 1973), affd. per curiam 501 F.2d 1338 (6th Cir.

---

[10] H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. A115 (1954); Hearings on H.R. 8300 Before the Senate Comm. on Finance, 83d Cong., 2d Sess, 403 (1954) (American Bar Association Report).

[11] Hearings on H.R. 8300 Before the Senate Comm. on Finance, 83d Cong., 2d Sess. 403, 539 (1954) (New York State Bar Association Report).

1974)), respondent abandoned his position that section 368(a)(1)(F) excludes per se the combination of two or more operating companies. Respondent announced his new position in Rev. Rul. 75–561, 1975–2 C.B. 129, which states:

In conformance with the *rules of these decisions,* it is now the position of the Service that the combination of two or more corporations may qualify as a reorganization within the meaning of section 368(a)(1)(F) of the Code, provided certain requirements are satisfied. * * * [Emphasis added.]

By its terms, the ruling applies only when there is a complete identity of shareholders and their proprietary interests in the combined corporations; the corporations combined are engaged in the same or integrated activities before the combination; and the business enterprise of the combined corporations is continued unchanged after the combination. Additionally, the loss carried back must be from a separate business unit or division that may be reunitized with pre-reorganization income earned by a transferor corporation. We have recently discussed and applied the general rules set out in Rev. Rul. 75–561. See *Berger Machine Products, Inc. v. Commissioner,* 68 T.C. 358 (1977), in which we held that petitioner failed to meet the requirement that the combined operating corporations have " 'complete identity of shareholders and their proprietary interests' in the acquiring corporation." 68 T.C at 363.

Similarly, petitioner herein fails to meet the requirement that there must be an *identity* of proprietary interest. This failure is readily discerned from the following chart which reflects the percentage ownership in the merged corporations before and after the reorganization:

PERCENTAGE OF STOCK OWNERSHIP

| Shareholder | Nevada | Company | Corporation | Enterprise | Illinois | Nevada |
|---|---|---|---|---|---|---|
| | | *(Dec. 29, 1967)* | | | | *(May 6, 1968)* |
| Romy Hammes | 100 | 17.40 | 71.56 | 63.58 | 53.08 | 61.36 |
| Gerald Hammes | 0 | 12.04 | 17.89 | 23.00 | 9.54 | 17.19 |
| Hammes Trust | 0 | 70.56 | 0 | 13.42 | 18.30 | 20.57 |
| Enterprise | 0 | 0 | 0 | 0 | 19.08 | 0 |
| 18 Employees of Corporation | 0 | 0 | 2.77 | 0 | 0 | 0 |
| Harry Greer | 0 | 0 | 3.22 | 0 | 0 | .36 |
| Floyd Parisot | 0 | 0 | .89 | 0 | 0 | .10 |
| Mrs. Don L. Cira | 0 | 0 | .89 | 0 | 0 | .10 |
| Mr. and Mrs. Wesley D. Glaser, Jr. | 0 | 0 | .63 | 0 | 0 | .08 |
| Mrs. Harvey Sult | 0 | 0 | .45 | 0 | 0 | .05 |

| | | | | | |
|---|---|---|---|---|---|
| Mr. and Mrs. Fred A. Root | 0 | 0 | .45 | 0 | 0 | .05 |
| Mr. and Mrs. Harold J. Smith | 0 | 0 | .45 | 0 | 0 | .05 |
| Mr. and Mrs. Hubert Stults | 0 | 0 | .36 | 0 | 0 | .04 |
| Mr. Carl A. Weinzetl | 0 | 0 | .18 | 0 | 0 | .02 |
| Mr. and Mrs. A. J. Hoerstman | 0 | 0 | .09 | 0 | 0 | .01 |
| Mr. and Mrs. Merle A. Durbin | 0 | 0 | .09 | 0 | 0 | .01 |
| Mr. and Mrs. John C. Lenko | 0 | 0 | .09 | 0 | 0 | .01 |
| Total | 100 | 100 | 100 | 100 | 100 | 100 |

For example, Romy Hammes prior to the merger owned 17.4 percent of Company, 71.56 percent of Corporation, 63.58 of Enterprises, 53.08 of Illinois, and 100 percent of Nevada. After the merger he owned 61.36 of Nevada. These varying percentages represent significant[12] differences in proprietary interest in the five corporations involved. This shift in proprietary interest, hardly complies with the requirement that there be an identity of shareholders and their proprietary interests.

In rejecting petitioner's argument that the merger here constituted an (F) reorganization, we also note that the different corporations merged were engaged in disparate business activities. In order to effect an (F) reorganization, respondent's ruling requires that the merging corporations be engaged in the same or integrated business activities. While Company, Enterprises, and Illinois all maintained some form of rental property, Corporation's sole business activity was the operation of a Ford dealership, and Company also had a Maytag appliance franchise. Nevada held option rights on its Hawaiian subleasehold before the merger of the five corporations. The combination of these corporations, therefore, created a multidimensional enterprise, one which was hardly identical to any of the individual premerger corporations. These circumstances serve to prevent the merger here from qualifying as an (F) reorganization.

Finally, we note that even where an (F) reorganization is present, the section 381 carrybacks may only be used to offset income generated by the same business unit or division that sustained the loss. Respondent's ruling adopts the rule

---

[12] Although we do not have such a situation before us, there may be some circumstances in which a de minimus shift in shareholder interest may be ignored for (F) reorganization purposes. See Rev. Rul. 66–284, 1966–2 C.B. 115.

articulated by the Fifth Circuit in *Home Construction Corp. of America v. United States,* 439 F.2d 1165, 1172 (5th Cir. 1971):

the taxpayer may offset net operating loss carry-backs only if it can establish that the losses of the new corporation can be reunitized for the sake of tax accountability into the same taxable units which existed before the reorganization. Thus, only such portion of the overall loss as can be shown to be attributable to each respective separate division within the new structure may be carried back, and then only be offset against gains of such division's premerger counterpart. * * *[13]

It is clear that in the instant case, petitioner does not meet the requirements of the ruling for the section 381 carryback. The Hawaiian operation was completely separate from any of the premerger activities of Illinois. Moreover, the Hawaiian hotel operation and Illinois activities were each treated as a separate division of Nevada after the merger.[14]

In the excellent briefs filed on its behalf, petitioner contends that in surveying the precedential landscape, respondent has drawn the boundaries too restrictively. The short answer is that the boundaries include a good deal more territory than is required by the precedents of this Court and still fall acres short of encompassing petitioner's circumstances. See *Berger Machine Products, Inc. v. Commissioner,* 68 T.C. 358 (1977).

We recognize, however, that the issue before us has spawned recurring and protracted litigation productive of uncertainty. This uncertainty impairs mobility of capital, increases compliance costs, and imposes inequities. In an area where predictability is important to business planning, respondent's concession is an attempt to articulate a clear and consistent ruling and litigating position "in conformance with the rules of these [adverse] decisions." Rev. Rul. 75–561, *supra,* 1975–2 C.B at 129.

However, as in *Berger,* the case before us does not present the occasion to delineate the precise boundaries of the many precedents respondent analyzes in Rev. Rul. 75–561, nor to reconsider the viability of previous decisions of this Court that are in conflict. That task must await another day for even

---

[13] See Rev. Rul. 75–561, 1975–2 C.B. 129.

[14] We note that in the absence of the merger, Nevada would not have been entitled to a loss carryback, and we do not believe the merger should or does provide it with one. See *Libson Shops, Inc. v. Koehler,* 353 U.S. 382 (1957).

were we to embrace the precedents that respondent's ruling distills, no reasonable reading of these precedents would encompass petitioner's circumstances.

*Decision will be entered for the respondent.*