THEODORE AND JOSEPHINE V. ROLE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ROBERT J. SWARTZ AND ADELE M. SWARTZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8577–76, 9087–76.     Filed May 25, 1978.

Theodore Role, pro se.

Robert J. Swartz, pro se.

*John O. Tannenbaum*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner(s) | Year | Deficiency |
|---|---|---|---|
| 8577–76 | Theodore and Josephine V. Role | 1973 | $7,065 |
| 9087–76 | Robert J. and Adele M. Swartz | 1973 | 7,495 |
| 9087–76 | Robert J. Swartz | 1970 | 1,201 |

The sole issue for decision in these consolidated cases is whether petitioners are entitled to ordinary loss treatment pursuant to section 1244[1] for losses sustained on their stockholdings in a corporation which was adjudicated bankrupt in 1973.

## FINDINGS OF FACT

Petitioners Theodore and Josephine V. Role, husband and wife, were legal residents of Milton, Mass., when they filed their petition. They filed a joint Federal income tax return for 1973.

Petitioners Robert J. Swartz and Adele M. Swartz, husband and wife, were legal residents of Braintree, Mass., when they filed their petition. They filed a joint Federal income tax return for 1973. For 1970, a year prior to his marriage, Robert J. Swartz filed his Federal income tax return with the Internal Revenue Service Center, Andover, Mass.

On November 27, 1967, Keystone Manufacturing Co. (Keystone) was incorporated in the Commonwealth of Massachusetts. Pursuant to a valid plan adopted under the provisions of section 1244, petitioner Theodore Role (Role) purchased 102 shares of Keystone's common stock at a cost of $51,000. Petitioner Robert J. Swartz (Swartz) purchased 200 shares of the corporation's common stock at a cost of $100,000. A third party, not involved in these proceedings, also purchased some shares.

Keystone manufactured camera and projector components for various general contractors and precision mechanical fuses for the United States Department of Defense. Keystone also produced microfiche readers as a subcontractor. In 1968 approximately 80 percent of Keystone's sales were made to the Government. In an attempt to diversify and to move out of a strictly subcontractor role, Keystone in late 1968 or early 1969 acquired two of its customers for whom it had been producing components—Bay State Mop Wringers and Optical Fibers, Inc.

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

These corporations became wholly owned subsidiaries of Keystone, and their names were changed to Bay State Industrial Equipment Corp. and Keystone Optical Fibers, Inc., respectively. With these acquisitions, Keystone began producing and selling a line of industrial cleaning equipment and optical fiber instruments which were able to refract light so as to permit the instruments' users, primarily medical diagnosticians, to transmit the light around bends and turns so as to facilitate examinations.

On April 18, 1969, Keystone underwent a reorganization whereby it reincorporated in the State of Delaware and changed its name to Keystone Bay State Industries (KBSI). Swartz exchanged his 200 shares of Keystone stock for 123,000 shares in KBSI. Role exchanged his 102 Keystone shares for 62,730 shares of KBSI. Subsequently, Role transferred by gift 16,500 KBSI shares, leaving himself with 46,230 shares with a cost basis of $37,585.

During 1970, as a result of declining business from the Department of Defense, KBSI again sought diversification through merger. At the time, KBSI was manufacturing microfiche readers as a subcontractor for a company known as Arcada. Arcada decided to terminate its microfiche business and introduced KBSI to Micro-Scan Systems, Inc. (Micro-Scan), a publicly held New York corporation. Micro-Scan had developed a hand-held microfiche reader, but it lacked the capital to begin production. KBSI began negotiations for the possible acquisition of Micro-Scan with the objective of combining the microfiche operations of the two companies and adding the hand-held reader to KBSI's previous line of equipment.

On January 5, 1971, KBSI and Micro-Scan executed a Merger Agreement and Plan of Reorganization (merger agreement) and an Agreement of Merger which was to become effective March 8, 1971. These agreements were ratified by the boards of directors and shareholders of the respective corporations during January and February 1971. Under the terms of the merger agreement KBSI was to be merged into Micro-Scan; the name of the surviving corporation (Micro-Scan) was to be changed to Keystone Micro-Scan, Inc. (referred to herein as KMS (N.Y.)); and the surviving corporation was to reincorporate in Delaware within 3 months after the effective date of the merger. KBSI's bylaws, with one minor modification not pertinent here, were to become the bylaws of the surviving corporation. The merger

agreement states, both in the introductory clauses and in the first operative paragraph, that the merger is a reorganization pursuant to section 368(a)(1)(A).

The merger of KBSI and Micro-Scan (KMS (N.Y.)) became effective on March 8, 1971. As a result of the merger, the former stockholders of Micro-Scan, as a group, held 200,000 shares (11 percent) of the outstanding stock of KMS (N.Y.). The majority of these shares were held by three individuals. Petitioners Role and Swartz held 127,409 shares and 338,988 shares, respectively, of KMS (N.Y.).

Pursuant to the requirement of the merger agreement that KMS (N.Y.) was to be reincorporated in Delaware, a Delaware corporation was formed with the name Keystone Micro-Scan, Inc. (hereinafter referred to as KMS (Del.)), and KMS (N.Y.) was subsequently merged into KMS (Del.), effective June 24, 1971. All of the stockholders of KMS (N.Y.) received the same number and percentage of outstanding shares of KMS (Del.) as they had held in KMS (N.Y.). Subsequently, Role transferred by gift 11,000 shares of KMS (Del.), reducing his holdings to 116,409 shares.

At the time of the merger of KBSI into Micro-Scan, KBSI had 320,000 square feet of production facilities in Boston. Of this, 2,000 square feet were eventually assigned to the microfiche activities which had originated with Micro-Scan. In addition, at this time KBSI had approximately 600 employees, whereas Micro-Scan had only 4 employees.

Short year income tax returns for Micro-Scan, for the period July 1, 1970, through April 3, 1971, and for KMS (N.Y.) (formerly KBSI) and consolidated subsidiaries for the period December 1, 1970, through April 3, 1971, reflected the following:

| Taxpayer | Total assets | Gross sales |
| --- | --- | --- |
| KMS (N.Y.) and subsidiaries | $2,574,238 | $2,929,974 |
| Micro-Scan | 343,748 | 234,442 |

As a result of various financial difficulties (including price controls, prime interest rate increases, and loss of its Government contracts), KMS (Del.) entered bankruptcy proceedings and was adjudicated bankrupt in November 1973.

On their 1973 joint Federal income tax return, petitioners Theodore and Josephine V. Role reported a loss of $36,374 with respect to Role's shares of KMS (Del.) which had become

worthless upon its bankruptcy. This loss was deducted as an ordinary loss under the provisions of section 1244.

Similarly, on their 1973 joint Federal income tax return, petitioners Robert J. Swartz and Adele Swartz claimed an ordinary loss of $50,000 with respect to Swartz's shares of KMS (Del.). In addition, in March or April 1974, Swartz filed an Application for Tentative Refund from Carryback of Net Operating Loss or Unused Investment Credit, Form 1045, with the Internal Revenue Service Center, wherein he sought to carry back the 1973 $50,000 section 1244 stock loss to 1970. Pursuant thereto, he received a refund of 1970 taxes paid in the amount of $1,201.

Respondent determined that the losses sustained by petitioners did not qualify for ordinary loss treatment under section 1244 but were, rather, capital losses. The resulting deficiencies were computed by allowing only capital loss deductions for 1973 and disallowing completely Swartz's net operating loss carryback to 1970.

## OPINION

At the time of the bankruptcy of KMS (Del.) Swartz and Role claimed ordinary loss deductions with respect to their stockholdings therein. Ordinarily, when an investment in corporate stock becomes worthless the resulting loss is deductible only as a capital loss for Federal income tax purposes. Sec. 165(g). However, section 1244 provides a limited exception, allowing an ordinary loss deduction, under well-defined circumstances, for worthlessness of certain "small business" stock. Petitioners rely upon section 1244 as the basis for their ordinary loss deductions. The benefit of section 1244 is only available with respect to stock which qualifies as "section 1244 stock," as defined in section 1244(c).[2]

---

[2]SEC. 1244. LOSSES ON SMALL BUSINESS STOCK.

(c) SECTION 1244 STOCK DEFINED.—

(1) IN GENERAL.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

(B) at the time such plan was adopted, such corporation was a small business corporation,

(C) at the time such plan was adopted, no portion of a prior offering was outstanding,

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and

(E) such corporation, during the period of its 5 most recent taxable years ending before the

It is clear that the stock of KMS (Del.) held by Swartz and Role did not meet these qualifications. Their KMS (Del.) stock was not acquired in an initial offering by KMS (Del.), for money or other property (other than stock or securities). It was acquired in a reorganization in exchange for their stock of KMS (N.Y.), which in turn had been acquired in a previous reorganization in exchange for their stock of KBSI.

Petitioners, however, rely upon the special rule of section 1244(d)(2),[3] under which the blessing attached to properly qualifying section 1244 stock can, under limited circumstances, carry over and attach to stock which may not otherwise qualify as section 1244 stock, but which is received in exchange for qualified section 1244 stock in certain types or reorganizations. The history of petitioners' stock holdings began with their organization of Keystone in 1967. It is undisputed that Keystone's stock was issued to Role and Swartz pursuant to a plan under section 1244 and was properly qualified section 1244 stock.

In 1969 Keystone incorporated in Delaware as KBSI and both Swartz and Role exchanged their Keystone shares for KBSI stock.

Respondent concedes that this transaction fell within the provisions of section 1244(d)(2), and, therefore, the stock of KBSI qualified as section 1244 stock. Respondent maintains, however, that the special rule of section 1244(d)(2), as interpre-

---

date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom); except that this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than by sections 172, 242, 243, 244, and 245) exceed the amount of gross income.

Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation.

[3]Sec. 1244(d)(2) provides as follows:

(2) RECAPITALIZATIONS, CHANGES IN NAME, ETC.—To the extent provided in regulations prescribed by the Secretary or his delegate, common stock in a corporation, the basis of which (in the hands of a taxpayer) is determined in whole or in part by reference to the basis in his hands of stock in such corporation which meets the requirements of subsection (c)(1) (other than subparagraph (E) thereof), or which is received in a reorganization described in section 368(a)(1)(F) in exchange for stock which meets such requirements, shall be treated as meeting such requirements. For purposes of paragraphs (1)(E) and (2)(A) of subsection (c), a successor corporation in a reorganization described in section 368(a)(1)(F) shall be treated as the same corporation as its predecessor.

ted in the regulations promulgated under the specific authorization of that subsection, did not operate to carry forward the section 1244 "blessing" to the stock of KMS (N.Y.) which was received in exchange for petitioners' KBSI stock in connection with the Micro-Scan merger in 1971. With this we agree. Simply stated, neither the KMS (N.Y.) stock nor the KMS (Del.) stock which eventually became worthless qualified as section 1244 stock within the narrowly defined limitations of that section, including the special carryover rules of subsection (d)(2), as interpreted in the regulations.

Section 1244(d)(2) provides for the carryover of section 1244 status only "To the extent provided in regulations prescribed by the Secretary." The regulations adopted thereunder, sec. 1.1244(d)–3(a), Income Tax Regs., describe only three situations where stock may be issued for stock and securities and still be considered section 1244 stock. These are stock dividends, section 368(a)(1)(E) recapitalizations, and section 368(a)(1)(F) reorganizations which involve "a mere change in identity, form, or place of organization, however effected."

In the instant case, there clearly was not a stock dividend. Thus, section 1244(d)(2) would be applicable only if the transaction in which Role and Swartz received KMS (N.Y.) shares in exchange for their KBSI stock (the March 1971 merger of KBSI into KMS (N.Y.)) qualified as a section 368(a)(1)(E) recapitalization or a section 368(a)(1)(F) reorganization. If not, the section 1244 characterization of the KBSI stock was terminated by that merger.[4]

Section 368(a)(1) lists several types of "reorganizations," in subparagraphs (A) through (F). Only those transactions which fall within subparagraphs (E) or (F) satisfy the requirement of section 1244(d)(2). The merger of KBSI into KMS (N.Y.) was clearly a statutory merger, falling within subparagraph (A); the merger documents specifically stated that the merger was intended to qualify under section 368(a)(1)(A). However, petitioners contend that even though the transaction qualified under subparagraph (A) it *also* qualified under subparagraph (F).

Section 368(a)(1)(F) at one time was considered applicable in only very rare situations, with most qualifying transactions

---

[4]In light of our conclusion that the KBSI–KMS (N.Y.) merger did not qualify under sec. 1.1244(d)–3, Income Tax Regs., we need not reach the question whether the subsequent KMS (N.Y.)—KMS (Del.) merger so qualified.

falling within the other five defined types of tax-free reorganizations. See generally *Romy Hammes, Inc. v. Commissioner*, 68 T.C. 900, n. 8 at 906 (1977). Although still used primarily in connection with minor corporate adjustments where there is a mere change in form, rather than a change in substance, subparagraph (F) has been more broadly applied in recent years to transactions involving corporate combinations akin to those contemplated by subparagraphs (A) through (D). See, e.g., *Movielab, Inc. v. United States*, 494 F.2d 693 (Ct. Cl. 1974); *Home Construction Corp. of America v. United States*, 439 F.2d 1165 (5th Cir. 1971); *Associated Machine v. Commissioner*, 403 F.2d 622 (9th Cir. 1968), revg. 48 T.C. 318 (1967); *Estate of Stauffer v. Commissioner*, 403 F.2d 611 (9th Cir. 1968), revg. 48 T.C. 277 (1967); *Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966), cert. denied 386 U.S. 1022 (1967).

In light of these decisions respondent has abandoned his former position that section 368(a)(1)(F) excludes per se the combination of two or more operating corporations. It is his current position, as stated in Rev. Rul. 75–561, 1975–2 C.B. 129, that the combination of two or more active corporations may qualify as an (F) reorganization as long as there is "complete identity of shareholders and their proprietary interests in the transferor corporations and acquiring corporations;" both the transferor and acquiring corporations are engaged in the same or integrated activities before the combination; and the business enterprises of both corporations are combined after the combination of the entities.

This Court in two recent opinions, *Romy Hammes, Inc. v. Commissioner, supra*, and *Berger Machine Products, Inc. v. Commissioner*, 68 T.C. 358 (1977), refused to reconsider the position it had taken in *Estate of Stauffer v. Commissioner, supra*, and *Associated Machine v. Commissioner, supra*, that the (F) reorganization does not apply to combinations of two or more active corporations, even though we are aware that the Ninth and Fifth Circuits and the Court of Claims, have rejected that position. Rather, we stated that in each situation petitioners failed to satisfy the requirements of Rev. Rul. 75–561, *supra*, since the combined operating corporations failed to have complete identity of shareholders and their proprietory interests. *Romy Hammes, Inc. v. Commissioner, supra* at 909–910; *Berger Machine Products, Inc. v. Commissioner, supra* at 363. In

addition, in *Romy Hammes, Inc. v. Commissioner, supra* at 910, the "different corporations merged were engaged in disparate business activities."

In the KBSI-KMS (N.Y.) merger there was continuation of the business enterprise and, arguably, both corporations were in the same activity of producing microfiche readers; however, there clearly was not complete identity between the shareholders of KBSI and KMS (N.Y.). None of the shareholders of KBSI were shareholders of Micro-Scan prior to the merger. Moreover, the former shareholders of Micro-Scan after the merger retained only 11 percent of the KMS (N.Y.) stock. One of such shareholders, Louis Verrone, who had owned over 20 percent of Micro-Scan's stock, liquidated his holdings in KMS (N.Y.) shortly after the merger. While the record is not clear on the point, it appears that this action was closely tied to the merger.

This was a combination of two totally unrelated corporations. One, KBSI, was closely held, and the other, Micro-Scan, was a public corporation. This combination could not be considered a mere change in identity, form, or place of organization, even if we were to ignore the narrow bounds set forth in Rev. Rul. 75–561, *supra.* We do not think that even those courts which have expanded the application of the (F) reorganization beyond the narrow confines to which we have consistently adhered would conclude that the KBSI-KMS (N.Y.) merger qualified under subparagraph (F). Even these courts require the identity of shareholders in the combining corporations, a critical element missing here. See *Movielab, Inc. v. United States*, 494 F.2d 693, 698 (Ct. Cl. 1974); *Home Construction Corp. of America v. United States*, 439 F.2d 1165, 1170 (5th Cir. 1971); *Associated Machine v. Commissioner*, 403 F.2d 622, 625 (9th Cir. 1968), revg. 48 T.C. 318 (1967).

It also appears clear that the KBSI-KMS (N.Y.) combination was not a section 368(a)(1)(E) recapitalization. Section 1.368–2(e), Income Tax Regs., and many cases dealing with recapitalization, speak of the "reshuffling of * * * [the] capital structure, within the framework of an existing corporation." *Helvering v. Southwest Corp.*, 315 U.S. 194, 202 (1942), rehearing denied 315 U.S. 829 (1942), second petition for rehearing denied 316 U.S. 710 (1942). See, e.g., *Bazley v. Commissioner*, 331 U.S. 737 (1947), rehearing denied 332 U.S. 752 (1947). The (E) recapitalization is limited to the readjustment of the capital structure of a single

corporation; this was obviously not the case with the merger of KBSI into Micro-Scan.

In presenting their case, petitioners place heavy emphasis upon the "reverse acquisition" aspect of the KBSI-Micro-Scan merger. They point out that although in technical form Micro-Scan (renamed KMS (N.Y.)) was the surviving corporation, in practical terms and in economic reality, the transactions amounted to KBSI, a substantial operating company with 600 employees, acquiring Micro-Scan, virtually a shell corporation, with little operating capital, only 4 employees, and no production capability. Although it seems clear from the facts that the transaction in question amounted to a so-called "reverse acquisition," this characterization has no legal significance that aids petitioners' cause.[5]

Relying upon the "reverse acquisition" aspect of the transaction, petitioners attempt to divide the Micro-Scan merger into two separate groups of transactions: a "recapitalization," name change, and reincorporation through which KBSI was transformed into KMS (N.Y.), on the one hand, and the acquisition of Micro-Scan, on the other. Thus, they argue that the first of these two separate segments qualifies as an (E) or (F) reorganization within the intendment of section 1.1244(d)–3(a), Income Tax Regs. However, we can find no rational or precedential basis for such an approach to a transaction which in fact was no more than an ordinary statutory merger. Petitioners, who were not represented by counsel herein, are simply not aided by such creative concepts.

Finally, petitioners argue that section 1.1244(d)–3(a), Income Tax Regs., is invalid because it fails to include reverse acquisitions which do not qualify as (E) or (F) reorganizations. The probable rationale for the regulation's exclusion of other types of reorganizations is that in other reorganizations the nature of the stockholder's investment (i.e., the company in

---

[5]Although we sympathize with petitioners' contentions that they were unaware that their sec. 1244 benefits would be affected by the form of the Micro-Scan acquisition and that if they had been so aware they would have structured the transaction differently, we are not in a position to alter what in fact was done or the tax consequences flowing therefrom. Moreover, we note that, although the transaction was a so-called "reverse acquisition," the surviving entity was a public corporation, and the merger documents are detailed and sophisticated instruments, apparently prepared by counsel. Thus, it appears that, whether or not all of the tax consequences (including the effect on petitioners' sec. 1244 stock) were considered by all parties, the ultimate structure of the transaction was not arrived at by happenstance.

which he holds his interest) has changed sufficiently from that which he acquired at the time of the original section 1244 stock purchase, that the benefits of section 1244 should no longer apply. It would seem that if this indeed is the rationale, such rationale would be equally applicable whether the section 1244 stock is held by the stockholders of the surviving corporation or the acquired corporation, or both. Yet the mechanics of section 1244(d)(2) operate in such a way that upon a statutory merger which does not qualify as an (F) reorganization, section 1244 stock in the hands of the stockholders of the surviving corporation will remain section 1244 stock, but the stock received by the stockholders of the acquired corporation will not carry forward the section 1244 characteristic of the stock exchanged.

Thus, petitioners' argument proceeds as follows: Because in a reverse acquisition the stockholders of the larger corporation become the major stockholders of the surviving smaller corporation, the practical result is the same as if the larger corporation had been the surviving corporation. Therefore, the carryover of section 1244 attributes should apply to the stockholders of the larger corporation as it would if such corporation had been the surviving corporation.[6]

This argument has a rational appeal. However, the favorable treatment accorded section 1244 shareholders of a surviving corporation follows from the basic provisions of section 1244(c)(1) (without resort to the carryover exception of subsection (d)(2)) and the denial of such treatment to shareholders of the acquired corporation clearly follows from the narrow limits imposed upon application of the subsection (d)(2) exception by section 1.1244(d)–3(a), Income Tax Regs. We believe that the explicit delegation of authority to issue regulations for the application of the section 1244(d)(2) exception effectively prevents us from altering the limitations contained in those regulations. See *Helvering v. Wilshire Oil Co.*, 308 U.S. 90 (1939), revg. 95 F.2d 971 (9th Cir. 1938), affg. 35 B.T.A. 450 (1937);

---

[6]In making this argument petitioners rely upon sec. 1.1502–75(d)(3), Income Tax Regs., dealing with "reverse acquisitions" in the area of consolidated returns. The thrust of this regulation is to treat a "reverse acquisition" as having the same consequences as an acquisition in which the larger corporation is also the surviving entity, for certain purposes in applying the rules for consolidated returns of related corporations. While we credit petitioners for their discovery of this obliquely relevant provision from the depths of the voluminous consolidated return regulations, it is not persuasive since we are here dealing with a statutory provision and a regulation thereunder which specifically delimits sec. 1244 carryovers to certain technically defined transactions.

*Koshland v. Helvering,* 298 U.S. 441 (1936), revg. 81 F.2d 641 (9th Cir. 1936), revg. a Memorandum Opinion of this Court.

Thus, the unambiguous provisions of the statute and regulations, as applied to the transactions as they were in fact structured, leave us no choice but to sustain respondent's determination that the KMS (Del.) stock held by petitioners, which became worthless in 1973, did not qualify for ordinary loss deduction under section 1244.

To reflect the foregoing,

*Decisions will be entered for the respondent.*